[Civ. No. 42394. First Dist., Div. Two. Jan. 8, 1980.]

GARY MILLER, Plaintiff and Respondent, v.
ELITE INSURANCE COMPANY, Defendant and Appellant.

COUNSEL

Bronson, Bronson & McKinnon, Paul H. Cyril and David W. Gordon for Defendant and Appellant.

Long & Levit, Ronald E. Mallen and Steven A. Lewis for Plaintiff and Respondent.

**OPINION**

**MILLER, J.**—Respondent Gary Miller (Miller) sued his motorcycle liability insurance carrier, appellant Elite Insurance Company (Elite), for breach of the implied covenant of good faith and fair dealing in Elite's handling of a claim brought against respondent by Warren and Margaret Johnsrude (Johnsrude claim). The Johnsrude claim was for damages resulting from a fire which Miller accidently caused while using his motorcycle. The court below directed a verdict for Miller on the issue of compensatory damages and the jury awarded Miller $150,000 in punitive damages.

In 1972, respondent Miller lived in a house owned by the Johnsrudes. Respondent shared the house with two other persons, William LaBelle and Stephen Kalla.

On June 24, 1972, respondent was working on his motorcycle in the garage which was beneath the house. There was a gas water heater a short distance away from where he was working. Gasoline fumes from his motorcycle were ignited by the pilot light of the water heater and a fire erupted causing damage to the garage and to the dining room above in the approximate amount of $11,000.

At the time of the fire, respondent carried liability insurance on his motorcycle with Elite Insurance Company. The policy afforded respondent coverage for bodily injury, property damage and physical damage. Also covered were the cost of defense and indemnity for occurrences covered by the policy. The policy contained an exclusion clause which stated: "This policy does not apply under Part I [Liability]:...(e) to injury to or destruction of property owned or transported by the insured, or property rented to or in charge of the insured."

The Johnsrudes carried fire insurance issued to them by National American Insurance Company (National). National paid the Johnsrudes claim for damages caused by the fire. Miller informed National's *agent of his policy with Elite and on December 21, 1972, National requested subrogation of the fire damage from Elite.*

Miller's claim against Elite had been handled by the San Francisco claims manager, James Ryan III. Ryan and his supervisor, Paul Woodson, received and reviewed motorcycle liability claims directed to Elite and developed company policy for settlement of such claims.

Shortly after receiving National's demand for subrogation, Ryan established a $2,000 reserve fund for the claim. Elite accepted the estimated amount of damages suffered by the Johnsrudes. Ryan, as Elite's representative, determined that there would be a 50 percent chance that Miller would be held liable for the damage. In addition, Ryan estimated that since the policy limit was $5,000, the reserve was limited to that amount despite the fact that the claim was for approximately $11,000. A final factor for Elite in deciding on a yet further reduced amount of $2,000 for the reserve fund was Ryan's assessment of the very strong potential that Elite would deny coverage because of exclusion (e). The reserve was established on December 29, 1972, and Miller was not advised of Elite's coverage defense during the following nine months.

The insurance investigator hired by Elite questioned Miller in person twice and on the telephone several times. In these conversations Miller was reassured as to the policy limit of $5,000. Miller was not informed of a potential coverage problem. In March 1973, National made a second demand for subrogation. In response, on May 12, 1973, Elite offered to compromise the claim for $3,000. Elite informed National that nonacceptance of the compromise figure would trigger denial of the claim because of exclusion (e). National responded with a demand to be held open for 30 days for a $5,000 compromise of the claim. Copy of this letter was sent to Miller by National. Miller assumed that the coverage claims were taken care of by the $5,000 limit of the Elite policy.

Ryan testified that Elite's position was as follows: (1) The Miller claim could be settled for $5,000; (2) Elite would pay no more than $3,000; (3) Miller could contribute the additional $2,000; (4) if no settlement were made, Elite would deny coverage and defense of the suit against Miller; (5) if there were no settlement and Elite were not to defend, Miller would have to defend a claim of $11,000 plus costs of approximately $2,000.

Elite did not inform Miller of its position. Elite did not accept National's demand for a $5,000 compromise of the claim. National

brought suit against Miller for the $11,000 in damages and Miller subsequently contacted Elite to ask whether he had to engage an attorney privately, whether the second National demand letter had been received by Elite and why he had been told that he would not be sued for damages. Finally, in October 1973, Ryan told Miller that the Elite policy did not cover Miller's claim. Ryan did not ask to see the complaint in the National suit against Miller.

Miller then retained private counsel to defend his interests and, under a negotiated agreement, Miller agreed to pay $3,000 to National, plus attorney's fees. National would then seek to recover the balance of the claim from Elite and Miller would retain any punitive damages that might be awarded.

Miller brought an action against Elite in March 1977, and the trial court directed a verdict against Elite on the compensatory damages. The question of punitive damages was submitted to the jury which awarded $150,000 to Miller.

Appellant's contentions are numerous but basically group themselves into three areas: (1) the directed verdict for Miller for compensatory damages was improper, (2) the punitive damage award was improper and (3) Miller's counsel improperly argued in final argument to the jury.

■ Appellant's first contention on appeal is that there was no coverage for the fire damage to the Johnsrude property under respondent Miller's policy with Elite because of the exclusion clause (e). Appellant argues that Miller was a tenant, thus a renter of the damaged property and that the property was also in his charge or control.

■ As to the first of the two exclusionary factors, it is well established that a tenancy need not be created by a lease but may be created by occupancy by consent. (*Ellingson* v. *Walsh, O'Connor & Barneson* (1940) 15 Cal.2d 673, 675 [104 P.2d 507].) One who has no lease but pays on a month-to-month basis becomes a tenant. (Civ. Code, § 1944.)

■ Miller originally shared the Johnsrude house on a temporary basis to last only so long as the roommates remained amicable. The rent was paid by Kalla with his personal check and the two roommates contributed a share of the expenses to Kalla. There was no written rental

agreement or lease signed by any of the roommates, but they were occupying the premises with the owner's consent. Thus arguably Miller was a tenant although there is no indication that he rather than Kalla would have been independently liable for the rent as it accrued.

The other exclusionary factor, "property in charge of the insured," gives rise to problems of interpretation. (Melnick, Cal. Automobile Insurance Law Guide (Cont.Ed.Bar 1973) § 5.3.) Clauses of this type have been much litigated and held to be both ambiguous and unambiguous. (*Home Indemnity Co.* v. *Leo L. Davis, Inc.* (1978) 79 Cal.App.3d 863, 871 [145 Cal.Rptr. 158].) There are no definitive cases which inform this court of the California position on the effect of the "property in charge of the insured" phrase. Appellant cites cases from other jurisdictions in support of his argument. Primary reliance is placed on *Wright Construction Co.* v. *St. Lawrence Fluorspar, Inc.* (Del.Super. 1969) 254 A.2d 252. This case can be distinguished because the defendant in *Wright* had leased a front-end shovel from the plaintiff and the defendant cross-complained against the insurer. The defendant in *Wright* was the operator of the rented front-end shovel and had exclusive control over its operation. In the present case, the property in question was real property over which Miller did not have exclusive control. He was arguably a tenant but he was not in exclusive control of the premises despite the fact that he was alone in the garage beneath the house when the accident occurred. At no time did Miller have exclusive use and control of the Johnsrude property.

■ Exclusionary clauses or exceptions are to be interpreted by their plain meaning and will not be stretched to cover areas not intended by the clause. (*Aas* v. *Avemco Ins. Co.* (1976) 55 Cal.App.3d 312, 321 [127 Cal.Rptr. 192].) But, any ambiguity is to be interpreted against the insurer and reasonable doubts as to uncertain language should be resolved against the insurer. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].) The policy should be read as a layman would read it, interpreting the terms in an ordinary and popular sense as a person of average intelligence and experience would understand them. (*Aas* v. *Avemco Ins. Co., supra,* 55 Cal.App.3d at p. 321.) Any exclusionary clause must be conspicuous, clear and plain and construed strictly against the insurer and liberally in favor of the insured. (*Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d at p. 115.) Where a strict, literal interpretation of a clause would unreasonably restrict the coverage

of the policy, such an interpretation cannot be foisted onto a layman nor can it be defended in terms of the risks which the layman sought to insure against. (*Schilk* v. *Benefit Trust Life Ins. Co.* (1969) 273 Cal. App.2d 302, 308 [78 Cal.Rptr. 60, 39 A.L.R.3d 1019].)

■ The exclusionary clause at issue in this case is not unambiguous despite the fact that it virtually mirrors the language of Insurance Code section 11580.1, subdivision (c)(6). The exception refers to "property owned or transported by the insured, or property rented to or in charge of the insured." There is no indication whether any or all of the "property" referred to is real property or chattel goods. No lay person could reasonably assume that the phrase "property rented to or in charge of insured" refers to real property since the preceding phrase would seem to be applicable primarily to portable goods.

Additionally, the exclusionary clause was not presented in a conspicuous, clear and plain fashion. "Thus we held in *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284], that we would not enforce an exclusionary clause in an insurance contract which was unclear, saying: 'If [the insurer] deals with the public on a mass basis, the notice of noncoverage of the policy, in a situation in which the public may reasonably expect coverage, must be conspicuous, plain and clear.'" (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [54 Cal.Rptr. 104, 419 P.2d 168].) The exclusionary clause in Elite's policy appears in the second column of two columns of print, approximately one inch below other phrases. The paragraph on exceptions is in no way distinguished from any others in the document. The same type-face is used and the placement of the paragraph in the middle of the document is not likely to attract attention.

Thus appellant's argument that there was no coverage under clause (e) is questionable on the basis of whether Miller was a renter under terms of the exclusion and whether he was in exclusive control of the subject property. Furthermore, the exclusion clause is open to more than one interpretation and is inconspicuously placed in a standardized contract.

■ Appellant's second contention is that Elite had no duty to defend Miller because that duty would only arise for liability covered by the policy. Appellant finds no liability because the fire damage was excluded by exception clause (e); hence no duty to defend.

■ The duty to defend is broad and insurance policies must be interpreted so as to protect the reasonable expectations of the insured. (*Gray v. Zurich, supra,* at p. 275.) Where the parties are of unequal bargaining strength and the more powerful party offers a standardized, written contract, the court will interpret according to the weaker party's expectations. (*Id.* at p. 270.) An insurer must defend a suit which *potentially* seeks damages within the coverage of the policy. (*Id.* at p. 275.) In construing to protect the insured's reasonable expectations, the same standard will be used for exclusion clauses as for the body of the contract. (*Id.* at pp. 270, fn. 7, 271.) The obligation to defend is measured by the terms of the policy and the allegations of the complaint against the insured and where the complaint reveals potential liability within the policy, the duty to defend arises. (*Karpe v. Great American Indem. Co.* (1961) 190 Cal.App.2d 226, 233-234 [11 Cal.Rptr. 908].) If there is a doubt as to whether the insurer must defend, the doubt should be resolved in the insured's favor. (*Ritchie v. Anchor Casualty Co.* (1955) 135 Cal.App.2d 245, 251 [286 P.2d 1000].)

■ In the instant case, Miller sought to protect himself for damages flowing from his use of a motorcycle by purchasing a motorcycle liability policy from the appellant. Miller's reasonable expectation in the purchase of such a policy was that the insurer would cover damages caused by his motorcycle. The damage to the Johnsrude property was within the nature and kind of risk which Miller would have expected the policy to cover. According to testimony of Claims Manager Ryan, appellant foresaw a potential liability and duty to defend Miller's suit. Other indications that Elite perceived a possible duty to defend are the establishment of a reserve fund for the defense of the Miller claim and the offer of a compromise settlement with National. Because the California Supreme Court has argued that the insurer has a broad duty to defend where potential coverage exists, we find that Elite had a duty to defend.

■ The third contention on appeal is that Elite did not waive its coverage defenses by offering to settle the Johnsrude claim with National for 60 percent of Miller's policy limit.

■ Waiver is the voluntary and intentional relinquishment of a known right. (*Loughan v. Harger-Haldeman* (1960) 184 Cal.App.2d 495, 502 [7 Cal.Rptr. 581].) Waiver may be express (*Crest Catering*

*Co.* v. *Superior Court* (1965) 62 Cal.2d 274, 278 [42 Cal.Rptr. 110, 398 P.2d 150]) or implied from conduct (*Howard J. White, Inc.* v. *Varian Associates* (1960) 178 Cal.App.2d 348, 355 [2 Cal.Rptr. 871]). An insurer can waive policy provisions which would otherwise defeat coverage. (*Dalzell* v. *Northwestern Mutual Ins. Co.* (1963) 218 Cal.App.2d 96, 101 [32 Cal.Rptr. 125].) Where an insurer reserves its right to claim noncoverage under the policy, notice of the reservation must be given to the insured or the reservation is deemed waived. "...[I]f a liability insurer with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. In other words, the insurer's unconditional defense of an action brought against its insured constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert such grounds." (14 Couch on Insurance (2d ed. 1965) § 51:77, pp. 579-582, fns. omitted.)

 Elite, by its conduct in proceeding to deal with National as though Elite intended to represent and defend Miller, created the impression that there was no coverage dispute. Further, appellant never communicated to Miller that the insurance company intended to reserve its rights based on possible noncoverage under exclusion clause (e). It appears from the record below that the insurer's agent, Ryan, was uncertain about Elite's duty to defend. It may be that by its conduct alone Elite waived the right to reserve a denial of coverage, but coupled with its failure to notify Miller of the contemplated reservation, waiver of the right was established.

 Appellant's fourth claim on appeal is that Elite is not estopped to assert its coverage defenses because there was neither injury to the respondent nor detrimental reliance by him.

 To find equitable estoppel, one must show: (1) that the person to be estopped had knowledge of the true facts; (2) that action on his part intended or reasonably interpreted as intended to be acted upon by the person asserting the estoppel; (3) that the one asserting the estoppel was ignorant of the true facts; and (4) that there was detrimental reliance on the estopped person's conduct. (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d

264].) Estoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist. (*Aetna Casualty & Surety Co.* v. *Richmond* (1977) 76 Cal.App.3d 645, 652-653 [143 Cal.Rptr. 75].) While this statement of the rule is generally applied, there is a well-established exception: "The general rule supported by the great weight of authority is that if a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. In other words, the insurer's unconditional defense of an action brought against its insured constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert such grounds." (*Insurance Company of North America* v. *Atlantic National Insurance Co.* (4th Cir. 1964) 329 F.2d 769, 775-776.) The duty to defend, where it exists, exists at the prelitigation as well as litigation stages and California courts recognize that a large percentage of insurance claims are settled without litigation. (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883].) The insurer's duty of good faith and fair dealing extends to prelitigation settlement negotiations. (*Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 797 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142].)

 In the present case, Elite was in possession of all facts bearing on the Miller claim including potential coverage problems, the amount of damage claimed, offers to compromise the claim and probable liability estimates. In purchasing motorcycle liability insurance, Miller could reasonably have interpreted that Elite would act on his behalf where there were damages caused by his motorcycle. Miller was ignorant of the true facts: Elite never informed him of a reservation of the right to deny coverage or of the offer to compromise the claim. Miller relied to his detriment on Elite's defense under the policy as evidenced by his failure to retain an attorney, his failure to negotiate with either Elite or National, and his failure to deal directly with the Johnsrudes or their attorney. Further, Miller was denied the possibility of choosing to settle the claim by compromise because he was not informed of National's first offer and Elite's subsequent refusal. Miller, when informed by National of their second offer of compromise for $5,000, assumed that there was no problem because that amount was within his policy limit. It would appear that all of the criteria of estoppel are met and that

there is sufficient evidence to show that Miller justifiably relied on Elite's posture as diligent insurer protecting the interests of the insured. Elite is estopped from asserting its coverage defenses.

The fifth contention appellant advances is that the trial court erred in directing a verdict on the issue of breach of the implied covenant of good faith and fair dealing. The directed verdict was based on Elite's failure to defend Miller and to settle the claim. Appellant argues that the decision was incorrect as a matter of law or alternatively that the decision usurped the jury's function.

Every insurance contract contains an implied covenant of good faith and fair dealing. (*Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at p. 659. Wrongful failure to defend opens the insurance carrier to liability for the whole amount of the judgment including any amount in excess of the policy limits. (*Ibid.*) Good faith and fair dealing means that each party is prevented from interfering with the other's right to benefit from the contract. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032].) The covenant of good faith and fair dealing is always a prominent issue in the settlement phase of insurance cases because of the possibility of a conflict of interest between the interests of the insurer and the insured. (*Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858 [110 Cal.Rptr. 511].) Where a conflict of interests emerges, the carrier has the obligation of protecting the interests of the insured equally with his own. (*Id.* at p. 868.) When such a conflict occurs, it arises not at the litigation stage but rather at the moment when a third party claimant offers to settle an excess claim within the policy limits. (*Id.* at p. 873.) The measure for determining whether the insured's interests were properly considered is whether a prudent insurer without policy limits would have accepted the settlement offer. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173].) In deciding whether to compromise the claim, the insurer must conduct itself as though it alone were liable for the entire amount of the judgment. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 16 [123 Cal.Rptr. 288, 538 P.2d 744].) The insurer must give informed consent to any offer of settlement and must advise the insured of the offer and the company's assessment of that offer. (*Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 791 [121 Cal.Rptr. 200].)

■ A directed verdict is proper under the following standard: "...[A] directed verdict may be granted 'only when, disregarding conflicting evidence and giving to [the opposing parties] evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the [opposing party] if such a verdict were given.' [Citations.] Unless it can be said as *a matter of law,* that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citations.]...[T]he function of the trial court on a motion for a directed verdict is analogous to...that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict." (*Estate of Lances* (1932) 216 Cal. 397, 400-401 [14 P.2d 768], italics added.) Where only one inference may be drawn from the evidence the question may be one of law. (*Loughan* v. *Harger-Haldeman, supra.,* 184 Cal.App.2d at p. 503.)

■ Elite failed to defend Miller in the Johnsrude/National suit. Elite's claim manager, Ryan, assessed the damages at $11,000 and he estimated that Miller's liability was a 50 percent certainty. In evaluating the claim against Miller, therefore, Ryan considered that the liability would be $5,500, or in excess of the policy limits. The settlement demand of $5,000 was within policy limits and was reasonable as a matter of law where the damages sought would nearly double the amount of the policy limit. Ryan admitted that Elite had rejected settlement to save on potential coverage defense costs and policy limits (exhibit 5) and rejection on that basis is a breach of the implied covenant of good faith and fair dealing.

The responsibility of interpreting the insurance contract rests with the judge as a matter of law and the judge in this case found that there was a duty to defend and indemnify. Had the terms of the policy not sufficed, the estoppel theory was adequately supported by the evidence. The uncontradicted testimony of Elite's claims manager as to the reasonableness of the settlement offer, the failure to inform Miller of the coverage question and the settlement offers and, the underlying reason for rejecting National's offer present adequate support for a directed verdict where no other reasonable conclusion is legally deducible.

Appellant's sixth contention is that there is no evidence to support an award of punitive damages. Appellant urges that there was no basis for finding the requisite intent in any of Elite's dealings with Miller.

Although the law does not favor punitive damage awards, they should be granted for oppression, fraud, malice to vex, injure, annoy or where there is a conscious disregard of the plaintiff's rights. (*Beck* v. *State Farm Mut. Auto. Ins. Co.* (1976) 54 Cal.App.3d 347, 355 [126 Cal.Rptr. 602].) Malice is formed before the occurrence takes place and is wilful, intentional and done in reckless disregard of its possible results. (*Trammell* v. *Western Union Tel. Co.* (1976) 57 Cal.App.3d 538, 557 [129 Cal.Rptr. 361].) An insurer, to be guilty of breach of good faith dealing where punitives are awarded, must have been found to have acted with actual malice and that malice (including malicious intent) may be inferred from the circumstances of the case. (*Richardson* v. *Employer's Liability Assurance Corp.* (1972) 25 Cal. App.3d 232, 245 [102 Cal.Rptr. 547].) Civil Code section 3294 requires an act which constitutes fraud, malice or oppression before punitive damages can be granted. In breach of good faith insurance cases, oppression has been defined as a conscious disregard of the insured's rights by the insurer. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 463 [113 Cal.Rptr. 711, 521 P.2d 1103].)

The facts of this case have been stated and restated in discussion of the other issues on appeal. It is sufficient here to reiterate that Elite in its breach of the covenant of good faith and fair dealing knowingly exposed Miller to $11,000 in damages when his claim could have been compromised for half that amount. Appellant denied Miller the opportunity to contribute to the settlement and despite Elite's awareness of an insurer's duty to inform the insured of reservations and settlement offers, appellant did not so inform Miller. Ryan, acting in a capacity of responsible management personnel, admitted at trial that he was aware of the insurer's correct standard of conduct but that Elite consciously chose to put its own interests before those of the insured. We find that appellant's assertion regarding punitive damages is without merit.

The seventh issue appellant raises is that the jury was misled by the directed verdict for breach of the covenant of good faith and fair dealing. Appellant reasons that the jury could only have concluded from

that verdict that if Elite had breached its covenant, it must therefore have been guilty of bad faith and malice.

■ Bad faith failure to settle need not be based on dishonesty, fraud or concealment but may be based on an unwarranted refusal to meet the duty to accept reasonable settlements. (*Cain* v. *State Farm Mut. Auto. Ins. Co., supra,* 47 Cal.App.3d at p. 792.) Where the judgment exceeds the liability policy limits, the size of the judgment furnishes an inference that the value of the claim against the insured is equivalent of the amount of judgment and that acceptance of settlement within the policy limits was the most reasonable method available to the insurer. (*Johanson* v. *California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d at p. 17.)

The size of the judgment against Miller was twice the value of the claim against him so it would be proper to infer that National's settlement offer should have been accepted as the most reasonable way to handle the claim. Therefore, Elite's breach was based on an unwarranted refusal to meet the duty to accept reasonable settlements. Appellant cites no single instruction or statement by the judge which would even imply that the appellant should either be found guilty of bad faith and/or malice or that punitive damages should be given. As example, one instruction given was: "Now, the fact that the court has directed a verdict for compensatory damages does not necessarily establish that the defendant acted with these elements of intent. You are instructed that the primary function of punitive damages is to deter the defendant and those similarly situated from engaging in similar tortious conduct in the future." Several variations and elaborations of this instruction were given by the judge. We can find no support for appellant's argument that the punitive damage issue was presented in a misleading context.

■ Punitive damages are awarded as punishment and also as a deterrent to future improper conduct. (*Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270 [95 Cal.Rptr. 678].) An appellate court may intervene if the amount appears excessive. (*Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308 [81 Cal.Rptr. 855, 461 P.2d 39].) There is no fixed ratio between the compensatory and punitive damages. (*Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 283 [137 Cal.Rptr. 635, 562 P.2d 316].) Where punishment and deterrence are to be effective, the amount must be tailored to the defendant's financial

status. (*Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416].) The standard to be used on review of damages is that there is a presumption in favor of the correctness of the award and it should only be set aside after a consideration of the entire record reveals that the award resulted from passion or prejudice by the jury. (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 408 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) The object of exemplary damages is to make an example of the improper behavior and in so doing the jury may consider the wealth of the defendant and may exercise broad discretion. (*Wetherbee* v. *United Ins. Co. of America, supra,* 18 Cal.App.3d at pp. 270-271.)

█ Appellant's eighth contention is that the amount of punitive damages is excessive. Appellant states that the propriety of the award can best be tested by examining its relationship to the compensatory damages. The punitive award here is 10 times greater than the compensatory damages. Appellant also urges that another consideration must be the percentage of the defendant's assets which the punitive damages represent. The figures on which appellant relies indicate that the punitive award is 18 percent of Elite's net worth.

Appellant maintains that from assets of $14,125,488, liabilities in the amount of $13,322,749 should be subtracted, leaving Elite with a net worth of $802,739. The punitive damage award would then represent 18 percent of the net worth. Respondent argues persuasively that appellant's net worth figure was calculated without including some unadmitted assets and unearned premiums. Depending on which figures are admitted or omitted, it is possible that the jury did not accept Elite's net worth assessment. In that case, the net worth could have been as high as $5 million - $6 million. The punitive damage award relationship to these figures is 2-3 percent. There does not appear to have been passion or prejudice in the jury's award. Over 100 pages of financial documents were introduced into evidence and the jury may have considered these in making its deliberation.

In addition, Ryan testified that when he was employed elsewhere he had used the same procedure as he used in Miller's case six other times. He was responsible for establishing policy at Elite and the award of punitives is proper to deter either continuing or future improper conduct. We find no error in the amount of punitive damages.

Appellant's ninth and final contention is based on alleged misconduct of counsel in the presence of the jury. Appellant states that plaintiff's counsel repeatedly referred to the fact that Elite is a Canadian corporation in an attempt to emphasize defendant's alien status and appeal to the jury's prejudice. Appellant also indicates that counsel urged the jury to deliberate in anger and that he appealed to the jury's self-interest.

Generally, to preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial. (*Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 468 [130 Cal. Rptr. 786].) No objection is required where conduct is so egregious that an admonition from the bench would not cure it. (*Ibid.*)

Appellant made only one objection to the alleged instances of misconduct: namely to Ryan's handling of six other cases in the same manner as he had handled Miller's. Upon objection, both the court and counsel restated the matter correctly to the jury. Scrutiny of the record below, including the alleged misconduct, reveals that appellant's final contention is entirely without merit.

In conclusion, we find that there was no error in finding appellant liable for the compensatory damages awarded, nor was there error in directing a verdict on this aspect of the case. We also find that the award of punitive damages was proper and not excessive in amount. And finally, we find that there was no misconduct of counsel in the presence of the jury.

Judgment affirmed.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied February 7, 1980, and appellant's petition for a hearing by the Supreme Court was denied March 6, 1980.