**Theodore KANNE, and Beatriz Kanne, Plaintiffs,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Connecticut corporation; the Lincoln National Life Insurance Company, an Indiana corporation; Metropolitan Life Insurance Company, a New York corporation; Harlow Carpets, Inc., a California corporation; Hart, Shaffner & Marx, a General Partnership; Does 1 through 50, Inclusive, Defendants.**

**No. CV 83–2261–ER.**

United States District Court, C.D. California.

Jan. 23, 1985.

Carol Hay, Ernest Franceschi, Jr., Lakewood, Cal., for plaintiffs.

Suzanne Clover, James S. Cline, Adams, Duque & Hazeltine, Los Angeles, Cal., Owen Strange, Booth, Mitchell, Strange & Smith, Los Angeles, Cal., for defendants.

RAFEEDIE, District Judge.

This matter came on regularly for trial on March 6, 1984, before the Honorable Edward Rafeedie, United States District Judge. Plaintiffs Theodore Kanne and Beatriz Kanne appeared with their attorneys of record, Carol A. Hay and Ernest Francheschi, Jr. Defendant Connecticut General Life Insurance Company appeared through its attorneys of record, Adams, Duque & Hazeltine, by James Cline and Suzette Clover. The Court, having heard the testimony of witnesses, having received oral and documentary evidence in the matter and having considered the pleadings and all of the records and files herein, renders its decision as follows:

## I. BACKGROUND

### 1. *Procedural*

On December 17, 1982 plaintiffs Theodore Kanne ("Theodore") and Beatriz Kanne ("Beatriz") filed this civil action in the Superior Court of the State of California for the County of Los Angeles. The defendants at that time were Connecticut General Life Insurance Company ("Connecticut General"), Lincoln National Life, Metropolitan Life Insurance Company ("Metropolitan"), Harlow Carpets, Inc. ("Harlow Carpets") and Hart, Shaffner & Marx. The complaint sought compensatory and punitive damages under state law for (1) breach of contract by failing to pay claims for medical benefits within a reasonable period of time, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of fiduciary duties, (4) common law fraud, and (5) breach of statutory duties under California Insurance Code § 790.03.

Connecticut General and Metropolitan answered the complaint on March 18, 1983. In their answer, they denied plaintiffs' allegations and raised affirmative defenses, including failure to state a claim for relief as to all causes of action, full payment of benefits due, privilege to assert one's rights in good faith, the bars of California Insurance Code § 10111 and Civil Code § 3302, failure to mitigate damages, preemption by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1381, ("ERISA"), and failure to exhaust administrative remedies under ERISA, and the unconstitutionality of allowing punitive damages against the defendant for breach of the covenant of good faith and fair dealing.

On February 4, 1983, plaintiffs filed a Motion to Remand. The Court granted the motion on March 24, 1983. After the parties stipulated to the dismissal of Lincoln

National Life Insurance Company and Harlow Carpets on March 3, 1983, the action again was removed to federal court on April 8, 1983 on the basis of diversity jurisdiction. On April 19, 1983, Hart, Shaffner & Marx filed a Motion to Dismiss Extra-Contractual Claims, which the Court granted on May 23, 1983. On April 13, 1983, Metropolitan filed a Motion for Summary Judgment, which the Court granted on June 17, 1983. Although plaintiffs appealed these determinations, they subsequently dismissed their appeals. Finally, upon reaching a settlement with Hart, Shaffner & Marx on November 1, 1983, plaintiffs requested that Hart, Shaffner & Marx be dismissed with prejudice. The Court granted this request.

### 2. *Factual*

■ On May 23, 1981, Theodore was an employee of Harlow Carpets. Since Connecticut General had issued a group medical insurance policy (the "policy") to the ABC Trust, of which Harlow Carpets was a member, Theodore was covered as an eligible employee under the policy. The ABC Trust is administered by the Associated Builders and Contractors in Washington, D.C. Similarly, on the same date, Beatriz was covered as an eligible employee under a self-funded ERISA plan at her place of employment, Hart, Shaffner & Marx. This plan was administered by Metropolitan Life Insurance Company.[1]

Jonathan Kanne ("Jonathan") was born on May 23, 1981 to Theodore and Beatriz while they were vacationing in Holland. Although the policy provided primary coverage for Jonathan only from the date of application by his parents, ABC Trust later authorized coverage retroactive to May 23, 1981. The Hart, Shaffner & Marx policy provided Jonathan with secondary coverage

from May 23, 1981 through January 31, 1982.

Jonathan was born two months early with congestive heart failure. Within two weeks he was diagnosed as being cyanotic (a "blue baby") as a result of the heart failure. Shortly thereafter, Theodore provided this information to Connecticut General.

Doctors in Holland subsequently recommended that Jonathan be treated at Moffitt Hospital in San Francisco. Theodore advised Metropolitan of this recommendation and requested an advance payment for air transportation fees on KLM, Royal Dutch Airlines, in the sum of $3,000.00. This amount was to cover first class airfare for Beatriz and Jonathan, oxygen for Jonathan while in first class, and modification of the plane's electrical system necessitated by Jonathan's need for oxygen.

Because Connecticut General and Metropolitan refused to advance any portion of the requested sums, Theodore drove to Mexico to borrow the necessary money from his father. Jonathan thereafter was transported from Amsterdam to Los Angeles by KLM Airlines and from Los Angeles to San Francisco by Schaffer Air Ambulance.

After Jonathan arrived in San Francisco, Theodore obtained reimbursement in the sum of $698.40 from Metropolitan. Theodore then sought to recover the balance from Connecticut General under a coordination of benefits arrangement between the two insurance companies.

The Kannes dealt with Rosa Monostroi ("Rosa"), the Connecticut General Senior Benefits Analyst with primary responsibility for handling claims of the ABC Trust involving employees and dependents of Harlow Carpets. Rosa initially rejected the KLM claim on the ground that San Francis-

---

1. Although Beatriz was not covered as an eligible employee under the policy, Beatriz as Theodore's spouse is a party to the insurance contract and, therefore, has standing to sue for the claims asserted. The policy booklet states at page 4 that "you and your family members are eligible to participate in this plan ..." and further defines family members as one's spouse. Under the policy, therefore, Beatriz is able to recover expenses incurred on behalf of a dependent to the same extent as Theodore. Moreover, it is reasonably foreseeable that Beatriz, in addition to Theodore, could suffer emotional distress from Connecticut General's improper handling of the Kanne family's claims.

co was not the nearest hospital to Amsterdam. Thereafter, she changed her reasoning, determining instead that the treatment Jonathan was to receive in San Francisco was neither essential nor medically necessary.[2] She based these decisions on the wording of the policy which covers: "Charges for professional ambulance services to or from the nearest hospital where necessary care and treatment can be given." Rosa, however, determined that the Schaffer Air Ambulance bill was covered by the policy and, therefore, paid this claim promptly.

On October 22, 1982, Los Angeles Children's Hospital mailed to Connecticut General medical bills incurred by Jonathan for emergency surgery on September 15, 1981. Similarly, other medical providers involved in this hospital stay presented their medical bills to Connecticut General within a reasonable time after they were incurred. Notwithstanding provisions in the policy booklet calling for immediate payment upon receipt of proof of loss, Connecticut General delayed payment of a majority of these medical bills for three to eleven months after presentation. Similarly, Connecticut General delayed payment for over eight months of the claims sustained by Jonathan's hospitalization at Los Angeles Children's Hospital beginning on October 16, 1981. Theodore repeatedly telephoned Rosa who explained to him that the reason the bills had not been paid was that they had not been received. The claims file documents kept by Connecticut General, however, show that an itemized bill from Children's Hospital in the total amount of $89,840.16 was received by Connecticut General on December 29, 1981. Connecticut General paid $9,999.00 of that claim in February 1982, and $9,999.00 on March 1982. The latter part of October it paid $69,141.44 after it had received a collection agency claim in September 1982. It made

a last payment of $776.00 in late October 1982, after plaintiffs had retained counsel.

Connecticut General provided no explanation or justification for the delay in the payment of the $69,141.44 incurred by Children's Hospital from October 16, 1981 to November 13, 1981. Although Rosa testified that she did not receive an itemized bill for the $69,141.44, Connecticut General, as stated above, admits receiving the Children's Hospital bill in the sum of $89,840.16 on December 29, 1981. The balance forward on that bill was $69,141.44. Rosa explained that she thought this figure read $9,144.00, and that it already had been paid.

## II. DISCUSSION

### A. *Federal Preemption*

Connecticut General argues that the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1381, ("ERISA"), preempts all of plaintiffs' claims for relief. While under the facts of the case at hand plaintiffs initially could have sued in federal court under ERISA for benefits due and breach of fiduciary duty, they chose instead to rely solely upon state law. As explained below, plaintiffs as masters of their complaint, were free to make this choice since their state law claims are not preempted by ERISA.

The fact that ERISA may apply to a particular dispute because the plan under scrutiny is an ERISA plan—as is the case here—does not by itself answer the difficult question of ERISA's effect on state law claims against an insurance company. Rather, in order to resolve this issue, it is necessary to distinguish between state laws which regulate an employee benefit plan and those which regulate an insurance company from which a plan purchases insurance. Any law directly regulating an employee benefit plan is preempted, 29

---

2. In addition, she, at one time, told Theodore that the flight was not covered because it was a "pleasure trip."

Cf. *McLaughlin v. Connecticut General,* 565 F.Supp. 434, 453 (N.D. CA 1983) holding that both Mr. and Mrs. McLaughlin were parties to

the insurance contract, he as the "employee" and she as his "dependent" and thus both had standing to seek damages for emotional distress and other injuries for breach of the implied covenant.

U.S.C. 1144(a), but laws regulating an insurance company or policy from an insurance company are saved from preemption. *Eversole v. Metropolitan Life Insurance Co., Inc.*, 500 F.Supp. 1162 (C.D. CA 1980); *Accord McLaughlin v. Connecticut General Life Insurance Co.*, 565 F.Supp. 434 (N.D. CA 1983).

█ Section 1144(b)(2)(A) saves from preemption state laws which "regulate insurance." The phrase "regulating the business of insurance" has been defined as "statutes aimed at protecting or regulating this relationship, directly or indirectly." *See Eversole*, 500 F.Supp. at 1168, relying on *SEC v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 569, 21 L.Ed.2d 668 (1969); *McLaughlin*, 565 F.Supp. at 443. Under the facts of the case at hand, the purpose of the state laws underlying plaintiffs' claims is to secure the insured's rights as policyholders. As a consequence, these claims should be treated as insurance regulations which are saved from preemption as was the case in *Eversole* and *McLaughlin*. This conclusion is further strengthened by § 1144(b)(2)(B), the "deemer clause." That subsection prohibits a state from deeming an employee benefit plan to be an insurance company for the purpose of any state law regulating insurance. The effect of this clause is to prohibit a state from regulating a self-insured employee benefit plan as if it were an insurance company. *Eversole*, 500 F.Supp. at 1169; *McLaughlin*, 565 F.Supp. at 443.

█ *Russell v. Massachusetts Mutual Life Insurance Co.*, 722 F.2d 482 (9th Cir. 1983) does not compel a different result. In *Russell* the plans in question were self-funded employee benefit plans. Neither involved insurance policies. As a consequence, the savings clause of ERISA did not serve to protect the plaintiff's state law claims which were directed to the plans. In contrast, here, as in *Eversole* and *McLaughlin*, Connecticut General issued a group insurance policy to a plan. Since plaintiffs' claims are directed to this policy, the savings clause is triggered. *Russell*, therefore, does not alter the rule that any

law directly regulating an employee benefit plan is preempted, but laws regulating an insurance company or policy purchased from an insurance company are saved from preemption. *See Eversole*, 500 F.Supp. at 1170.

### B. *Substantive Claims*

### 1. *Coverage Under the Policy*

### (a) *KLM Airline Ticket*

█ Rules governing the interpretation of insurance contracts in California are well settled. First, ambiguities are construed against the insurance company. Therefore, coverage clauses are interpreted broadly in favor of coverage, while exclusions are interpreted narrowly. *McLaughlin*, 565 F.Supp. 434, 440 (N.D.Cal.1983); *see also State Farm Mutual Automobile Ins. Co. v. Partridge*, 10 Cal.3d 94, 101–02, 109 Cal.Rptr. 811, 816, 514 P.2d 123 (1973). Second, if two or more interpretations are reasonable, the court must adopt the interpretation which favors coverage. "If semantically permissible, an insurance contract will be given such interpretation as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates." *State Farm Mutual Automobile Ins. Co. v. Jacober*, 10 Cal.3d 193, 203, 110 Cal.Rptr. 1, 7, 514 P.2d 953, 960 (1973). In other words the insurer must establish that its interpretation supporting denial is the only reasonable construction of the contract. *McLaughlin*, 565 F.Supp. at 441. Third, the insurance contract must be considered in light of the insured's reasonable expectation of coverage. If coverage reasonably may be expected but is not to be provided, notice of noncoverage must be conspicuous, plain, and clear. *Id.*

█ Even if the ABC Trust, on behalf of its employer members, bargained for this contract, the California rules outlined above apply to the facts of this case. *See McLaughlin*, 565 F.Supp. 434; *Jones v. Crown Life Ins. Co.*, 86 Cal.App.3d 630, 150 Cal.Rptr. 375 (1978). Therefore, in order to prevail on the issue of the KLM bill,

Connecticut General must show either that the clause unambiguously excludes coverage or that the clause cannot be interpreted reasonably to provide coverage. As stated above, the clause in question covers "charges for professional ambulance service to or from the nearest hospital where necessary care and treatment can be given." At various times Connecticut General contended that the claim for the KLM flight was not subject to coverage because: (1) it was a pleasure flight; (2) the services were not performed at the nearest hospital where treatment could have been provided; and (3) the treatment was not essential and medically necessary.

The clause, however, does not specifically exclude from coverage the use of a passenger airline, does not state criteria to determine what is the nearest hospital where treatment could be received, and does not provide any guidance as to when and under what circumstances care and treatment is necessary. Furthermore, it is reasonable to interpret the clause as providing coverage for transportation upon a passenger airline to a hospital recommended by doctors for treatment which the doctors believe is essential and medically necessary. Although the doctors in San Francisco determined that Jonathan was too small and had to grow before the operation could be performed, the doctors in Holland thought that an immediate operation was necessary.

■ Even if the clause cannot be interpreted reasonably to provide coverage, Connecticut General is liable for the KLM bill because it breached its contractual duty to make an adequate investigation of plaintiffs' claims. The duty to investigate possible bases for an insured's claim includes the duty to investigate grounds for denying the claim. Prior to rejecting the claim for the KLM bill, Connecticut General neither investigated whether Moffitt Hospital was the nearest hospital nor whether the treatment Jonathan was to receive there was medically necessary. For example, Connecticut General never discussed with the physicians at Moffitt Hospital or with the referring physicians in Holland the necessity of Jonathan's receiving treatment at Moffitt Hospital as opposed to a hospital in Europe. Failure to substantiate the grounds for rejection through proper investigation renders Connecticut General liable for the claim.

For either reason set forth above, Connecticut General is liable for the KLM bill. Because Hart, Shaffner & Marx has paid $698.40, its share of the KLM bill under the coordination of benefits agreement, Connecticut General is liable for 80% of the remaining sum of $2,793.60 or $2,234.88.

(b) *Failure to Pay Other Claims Immediately*

■ Page 34 of the plan booklet states: "All benefits other than disability income benefits will be paid by Connecticut General immediately upon receipt of due proof." Connecticut General breached its contract with plaintiffs by failing to comply with this term.

The evidence at trial revealed that payment on many of the other claims was delayed for over nine months. For example, the $69,141.44 issued to Children's Hospital was not paid until Connecticut General received a collection agency claim, nine months after its receipt of the $89,840.16 bill with a balance forward of $69,141.44. Similarly, the last installment of the $89,840.16 bill in the sum of $776.00 was not paid until ten months after receipt of the bill.

Connecticut General neither has justified the delay in these payments nor has provided any rationalization for its failure to investigate in a timely fashion the status of the $69,141.40 sum. Connecticut General knew or should have known that the sum had not been paid at least as early as December 29, 1981, when it received the balance forward indication on the $89,840.16 bill. Connecticut General, therefore, breached its contract with the Kannes by failing to pay the claims "immediately upon receipt of due proof."

## 2. *Breach of the Covenant of Good Faith and Fair Dealing*

■ In addition to the duties imposed by the express terms of an agreement, the law in California implies in every contract a covenant of good faith and fair dealing. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980). This implied promise requires each contracting party to refrain from acting in any way that would impede the right of the other to receive the benefits of the agreement. *Egan*, 24 Cal.3d at 818, 169 Cal.Rptr. at 695.

■ Denial of a claim for insurance benefits where benefits were in fact due under an insurance contract is not, in and of itself, a breach of the implied covenant; an insurer is not required to pay every claim presented to it. *Austero v. National Cas. Co.*, 84 Cal.App.3d 1, 30, 148 Cal.Rptr. 653, 672.

Instead, in order to be liable· for breach of the implied covenant of good faith and fair dealing, Connecticut General must have acted unreasonably and in bad faith. *Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 461, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974); *Austero*, 84 Cal.App.3d at 27, 148 Cal.Rptr. at 670. Bad faith, in this context, is an imprecise label for what essentially is some kind of *unreasonable* insurer conduct. *Austero*, 84 Cal.App.3d at 27 n. 22, 148 Cal.Rptr. at 670 n. 22. Thus, generally, the substance or gravamen of the wrong in first party insurance cases (as distinguished from third party insurance cases where the insurance company is being sued for refusing to accept the third party's offer to settle his claim) is an *unreasonable* refusal to pay benefits due under the terms of the policy. The benefit contracted for by an insured under the terms of a policy is the availability of money promptly upon the occurrence of a particular event. When an insurer refuses unreasonably to make a payment of the benefit due, or when the insurer does not pay promptly, it deprives the insured of the essence of the bargain. The insured bar-

gained for prompt payment, not a right of action against the insurer. *Austero*, 84 Cal.App.3d at 30, 148 Cal.Rptr. at 670.

The facts of this case go beyond the typical first party insurance case in that all but one of the claims presented (the KLM airline ticket) have been paid. Nonetheless, the test of liability in this case is the same—whether Connecticut General's failure to investigate possible bases that may have supported plaintiffs' claims as well as its failure to pay these claims promptly was unreasonable.

■ From the evidence presented at trial, this Court has concluded that Connecticut General acted unreasonably in these respects. As stated previously, payment on several of the claims was delayed for over nine months. In addition, Connecticut General failed to investigate several of the claims, specifically, the KLM airline ticket, as well as the status of the $69,141.40 bill. Because Connecticut General acted in an unreasonable manner in handling plaintiffs' claims, Connecticut General breached the implied covenant of good faith and fair dealing.

This lawsuit could have been avoided nad there been better communication between the parties. While both sides share responsibility for this breakdown in communication, most of the blame rests with Connecticut General, a sophisticated insurance company whose obligation is to process claims in a timely, efficient, and cordial manner. People insure themselves for peace of mind and security. To protect these interests, it is essential that an insurer fully inquire into the possible bases that might support the insured's claim and act promptly. In this case, Connecticut General became overly pedantic and insensitive to plaintiffs during their time of great stress.

The Court does not find that the plaintiffs have been negligent in the submission of their claims. While they may have done so in stricter conformity with the defendants' requirements, their failure to do so was reasonable under all of the circumstances. Early on, defendants were placed

on notice that plaintiff's child was seriously ill, and would require extensive hospitalization and treatment. Repeated requests for payment of the bills were made to the claims representative, and copies of the bills were in defendants' possession. Under these circumstances, it is not proper for the insurer to sit back and delay payment of the claims, under the pretextual theory that the plaintiffs have not dotted all the "I's" and crossed all the "T's". On the contrary, the insurer has the duty to take the initiative to see to it that the promised protection is delivered when needed. It must act to facilitate the claims instead of searching for reasons not to do so.

### 3. *Breach of Fiduciary Duty*

██ Plaintiffs argue that Connecticut General breached its fiduciary duties in its dealings with them. California law, however, does not recognize an action for breach of fiduciary duty between an insurer and an insured.

An insurance policy is a contract. As such, there is implied within every insurance policy a duty of good faith and fair dealing. While this duty is fiduciary in nature, it does not create a fiduciary relationship. *See, Spindle v. Chubb/Pacific Indemnity Group*, 89 Cal.App.3d 706, 712, 152 Cal.Rptr. 776, 780 (1979).

In the insurance context, the implied covenant of good faith and fair dealing requires no more than "that each party is prevented from interfering with the other's right to benefit from the contract." *Miller v. Elite Ins. Co.*, 100 Cal.App.3d 739, 756, 161 Cal.Rptr. 322, 331 (1980). It does not further require that the insurer place the insured's interests above its own as would be the case were the insured a fiduciary. The *Miller* court also noted that, "where a conflict of interest emerges, the carrier has the obligation of protecting the interests of the insured [only] equally with his own." *Miller*, 100 Cal.App.3d at 756; 161 Cal. Rptr. at 331; *see also Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d at 818; 169 Cal.Rptr. at 695 (1979); *Silberg*, 11 Cal.3d at 460, 113 Cal.Rptr. at 717.

██ An insurance company, moreover, is privileged, in pursuing its own economic interests, to assert its legal rights. *Fletcher v. Western National Life Insurance Co.*, 10 Cal.App.3d 376; 89 Cal.Rptr. 78 (1970).

[A]n insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders (if it is such a company) not to dissipate its reserves through payment of meritless claims. Such a practice inevitably would prejudice the insurance seeking public because of the necessity to increase rates, and would finally drive the insurer out of business. *Austero*, 84 Cal.App.3d at 30, 148 Cal.Rptr. at 672.

Finally, as stated in *McLaughlin:*

it strains credulity to suggest, as defendant does here, that when an insurance company is the fiduciary [under ERISA] making claims decisions under a group policy, that it is due the same deference accorded to trustees who have no financial interest in their decisions. There is an inherent conflict of interest between an insurance company's duties to plan participants and to its policyholders. To remedy this conflict, California insurance law holds insurers to fiduciary standards by *inter alia* applying strict rules of construction against the insurer. *McLaughlin*, 565 F.Supp. at 447 n. 9.

In this case this Court has applied strict rules of construction against Connecticut General in order to remedy the inherent conflict of interest between its duties to its plan participants and its duties to its policyholders. Even were Connecticut General a fiduciary under ERISA, it would not be a fiduciary under California law. Under that law, while Connecticut General is obliged to act in good faith and deal fairly, this is not a fiduciary duty.

### 4. *Fraud*

██ Plaintiffs' complaint alleges a cause of action for fraud based upon Con-

necticut General's alleged promises to them which plaintiffs claim were made without intent to perform. Specifically, plaintiffs contend that the policy contained promises that any expenses incurred by reason of Jonathan's medical problems, including his air fare from Holland to Los Angeles, would be covered in full by coordination of benefits between the various insurance companies insuring plaintiffs. Plaintiffs further contend that they were induced by these promises to purchase a policy, and also relied upon the representation to refrain from procuring other insurance.

In order to prevail on their fraud claim, plaintiffs needed to show misrepresentation, knowledge of falsity, intent to defraud—that is, intent to induce reliance—justifiable reliance, and resulting damage. 4 Witkin, *Summary of California Law* Torts § 466 at 2711 (8th ed. 1974). The evidence at trial fails to support each of these elements. Connecticut General did not make any false representations that any medical expenses resulting from illness to Jonathan would be covered by the policy and paid promptly. The liability in this case stems from Connecticut General's failure to comply with their own internal regulations rather than from Connecticut General's intent to defraud.

5. *Breach of the Statutory Duties Imposed By Insurance Code Section 790.03(h)*

▮▮ Plaintiffs assert that Connecticut General violated §§ 790.03(h)(2) and 790.-03(h)(3) of the California Insurance Code. These sections prohibit respectively, the failure "to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies [,]" and the failure "to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies."

Connecticut General violated § 790.-03(h)(2) by failing to acknowledge and act reasonably promptly upon the Kanne's claims, notwithstanding Theodore's repeated efforts to obtain payment. Theo-

dore's many telephone calls to Connecticut General were unproductive. Eventually, he became so frustrated that following Jonathan's release from the hospital in February 1982, Theodore went to see Rosa. Although he presented to her, on that occasion, a number of the unpaid bills, which did not include the Children's Hospital bill in the sum of $69,141.40, several of these bills remained unpaid for many months thereafter.

Connecticut General, however, did not violate § 790.03(h)(3). Mr. Hanna, the Complex Manager at Connecticut General testified that Connecticut General has adopted and implemented standards for the prompt, accurate, and courteous investigation and processing of claims of policyholders. These standards are reasonable. Thus, although Rosa did not comply with these standards in handling the Kanne's claims, Connecticut General did not violate § 790.03(h)(3).

C. *Exemplary And Other Damages*

▮▮ Were plaintiffs to have prevailed on their breach of contract claim alone, they would be entitled only to the award of compensatory damages set forth above for the KLM ticket. Civil Code § 3294 provides:

In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Punitive damages thus are not available in an action based solely upon breach of a contractual obligation, even where the breach is intentional, willful, or in bad faith. However, where an action also sounds in tort, exemplary damages may be recovered upon proper showing of malice, fraud or oppression, even though the tort incidentally involves a breach of contract. *Miller v. National American Life Insurance Co. of California*, 54 Cal.App.3d 331, 336, 126 Cal.Rptr. 731, 733 (1976).

Plaintiffs, therefore, may be entitled to punitive damages on the tort theory on which they have prevailed, breach of the implied covenant of good faith and fair dealing. The mere fact that an insurer has breached its duty of good faith and fair dealing by acting unreasonably in handling a claim, however, does not mean that the insurance company automatically is liable for exemplary damages. *Austero*, 84 Cal. App.3d at 36, 148 Cal.Rptr. at 676; *Silberg*, 11 Cal.3d at 462, 113 Cal.Rptr. at 718. Exemplary damages may be awarded only where there is oppression, fraud, malice to vex, annoy or injure, or where there is a conscious disregard of a plaintiff's rights. *Miller v. Elite Insurance Co.*, 100 Cal. App.3d 739, 759, 161 Cal.Rptr. 322 (1980). Thus, to be liable for punitive damages on a breach of good faith and fair dealing claim an insurer must have acted with actual malice which may be inferred from the circumstances of the case. *Miller*, 100 Cal. App.3d at 758, 161 Cal.Rptr. at 333, (citing *Richardson v. Employer's Liability Assurance Corp.*, 25 Cal.App.3d 232, 245; 102 Cal.Rptr. 547, 556 (1972)); *See* also *BAJI* 6.94 and 14.71.

The evidence presented at trial established that Connecticut General acted with actual malice towards the Kannes. Connecticut General consciously disregarded the Kannes' rights by failing to process their claims in a prompt manner, by failing to investigate their claims, and by interpreting some of their claims in an unreasonable manner.

Connecticut General's breach of the implied covenant of good faith and fair dealing, and violation of Insurance Code § 790.-03(h)(2) were the proximate and direct cause of all loss, damage, emotional distress, embarrassment and fear of denial of medical treatment suffered by plaintiffs. Plaintiffs have suffered emotional distress, humiliation and embarrassment to their damage in the sum of $250,000.00. In addition, plaintiffs are entitled to exemplary damages in the sum of $500,000.00, an amount which the Court believes is sufficient to deter Connecticut General and oth-

er such insurance companies from treating their policyholders and insureds in the manner in which the Kanne's have been treated.

### D. Attorney's Fees

In the prayer of the complaint, plaintiffs seek to recover attorney's fees as an element of damages. In California, in the absence of an attorney's fee clause in the applicable insurance policy, attorney's fees are not recoverable in a bad faith action against an insurance company. *Moore v. American United Life Insurance Co.*, 150 Cal.App.3d 610, 644; 197 Cal.Rptr. 878, 900 (1984). The question, therefore, becomes whether or not there is an attorney's fee provision in the insurance contract between the Kannes and Connecticut General. The policy provides in pertinent part:

SUMMARY PLAN DESCRIPTION (Continued)

Under ERISA there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your plan, you should contact the Plan Admin-

istrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area office of the U.S. Labor—Management Services Administration, Department of Labor.

This summary plan description is meant to provide policyholders with an understanding of their rights under ERISA such as those set forth in 29 U.S.C. § 1132(g). That section states that: "In any action under this subchapter by a participant, beneficiary, or fiduciary, the court on its discretion may allow a reasonable attorney's fee and costs of action to either party."

Thus, although the summary plan description does not expressly restrict the Court's discretion to award attorney's fees to actions brought under ERISA, the description should be interpreted in this fashion. As a consequence, since the Kannes chose to proceed only under state law, the Court has no power to award them attorney's fees in this action. They are, however, entitled to their costs.

LET JUDGMENT BE ENTERED ACCORDINGLY.