[No. A097435. First Dist., Div. Three. Mar. 4, 2004.]

JOHN GARAMENDI, as Insurance Commissioner, etc., Plaintiff, v. GOLDEN EAGLE INSURANCE COMPANY, Defendant and Appellant; SCOTT CADE et al., Claimants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 3.b, 4, and 5 of the Discussion.

698

Timothy A. Gonzales for Defendant and Appellant.

Mahaffey & Associates, Douglas L. Mahaffey; Snell & Wilmer, Richard A. Derevan and Josette Mollica for Plaintiff, Claimants and Respondents.

**OPINION**

**POLLAK, J.**—A group of homeowners—plaintiffs in the underlying action and claimants in the proceedings from which this appeal was taken (claimants)—sued the developer of their subdivision for various alleged defects in their homes. The subcontractor whose liability is at issue in this appeal, Rampart General, Inc. (Rampart), was insured under commercial general liability policies issued by Golden Eagle Insurance Company (Golden Eagle). When Rampart and other subcontractors were brought into the litigation, Golden Eagle undertook the defense of Rampart. However, when Golden Eagle discovered on the eve of trial that Rampart's corporate status had been suspended for failure to pay franchise taxes, and that Rampart therefore could not participate in the litigation, Golden Eagle declined to intervene on its own behalf. Two other subcontractors remained in the litigation and, after a court trial, claimants obtained judgment against Rampart for $1,323,523.27, consisting of $283,322.33 property damages; $213,500.00 personal injury damages; $540,000.00 for Rampart's portion of the damages incurred by the developer, the right to recover which had been assigned to claimants as part of their settlement with the developer; and $286,700.94 as costs.

Claimants sought to enforce their judgment against Golden Eagle, which became insolvent shortly after the trial was concluded. The administrator in charge of the conservatorship of Golden Eagle denied their proof of claim in substantial part, on the ground that the underlying judgment was a default judgment inadmissible as evidence of Golden Eagle's liability. Claimants challenged that decision in the superior court, which concluded that the underlying judgment was not taken by default and therefore was enforceable against Golden Eagle. The San Francisco Superior Court (hereafter referred to as the "liquidation court" as distinguished from the trial court, which rendered the underlying judgment) also concluded that Golden Eagle had not

waived its coverage defenses by failing to assert them previously. The liquidation court proceeded to determine that there was coverage under the policies for all of the amounts included in the trial court judgment except for the property damages, that the trial court had allocated too great a share of the developer's damages to Rampart, and that the trial court had improperly included loss of use of the property as an element of personal injury damages. After making the appropriate adjustments, the court ordered the administrator to pay claimants $722,000.99 plus interest at the legal rate from March 7, 2001.

Golden Eagle appeals, challenging the ruling that the underlying judgment was not obtained by default, arguing that portions of the underlying judgment are in all events void because they exceed the amount demanded in the complaint, and disputing the liquidation court's determination that a portion of the judgment was covered by the policies. Claimants cross-appeal, arguing that the liquidation court erred in concluding that Golden Eagle had not waived its coverage defenses and that a portion of the judgment was not covered by the policies. We agree with the liquidation court that the underlying judgment was not a default judgment and therefore should have been considered by the claims administrator as evidence of Golden Eagle's liability, except to the extent the judgment was void because it included relief for personal injury damages and attorney fees not requested in the operative pleading in the underlying action. We question the liquidation court's conclusion that Golden Eagle retained the right to assert its coverage defenses, and remand for the liquidation court to determine if Golden Eagle is estopped from asserting those defenses. In the event the liquidation court finds that there was no estoppel, in the unpublished portion of this opinion we consider the coverage issues and conclude that the Golden Eagle policies covered none of the disputed damages, but did cover the costs of suit awarded to claimants as part of the underlying judgment. We also conclude that interest on the collectible portion of the judgment should be calculated from the date on which that judgment was entered.

BACKGROUND

In 1989 and 1990, claimants purchased homes in a development in Orange County from the William Lyon Company (Lyon). Rampart was the subcontractor that installed fireplaces in the homes, and it was insured under comprehensive general liability (CGL) policies issued by Golden Eagle. In August 1991, claimants filed suit against Lyon alleging damages resulting from construction defects. The complaint was amended numerous times. After the third amended complaint was filed, Lyon filed a cross-complaint for indemnity against Rampart and other subcontractors. Prior to filing the fourth amended complaint, claimants settled with Lyon. They received from Lyon $125,000.00 and assignment of Lyon's

claims against the subcontractors. The settlement stipulates that $37,712.50, or approximately 30 percent of the cash received in the settlement, represented the damage caused by the faulty fireplaces. The fourth amended complaint no longer named Lyon, but named Rampart and the other subcontractors as defendants.

The operative complaint at the time of trial appears to have been the fifth amended complaint,[1] which alleged Lyon's assigned causes of action for express and implied contractual indemnity, and claimants' own claims for negligence and breach of implied warranty. The amended complaint sought reimbursement for the amounts paid by Lyon to claimants, costs and fees incurred by Lyon in defense of the suit, and expenses incurred in repairing claimants' homes. The fourth amended complaint had requested special damages for medical bills and loss of earnings as well as a separate category described only as "general damages," but these categories were omitted from the fifth amended complaint.

In June 1996, the case was ready to proceed to trial against Rampart and two other nonsettling subcontractors. A few days prior to the start of trial, however, the attorney that Golden Eagle had hired to represent Rampart discovered that Rampart's corporate status had been suspended because it had failed to pay its franchise taxes, and therefore that it could not appear to defend the action. On the first day of trial, counsel for Rampart, counsel for claimants, and the court discussed the fact that Rampart had been suspended. The following Monday, the trial court indicated that it would grant a motion by Golden Eagle to intervene in the case to defend its interests, since Rampart could no longer appear. The trial court took a short recess to allow counsel to call Golden Eagle and ask if it wished to intervene, since its interests were at stake regardless of Rampart's ability to appear. The attorney

---

[1] The parties have chosen to file a joint appendix in lieu of the clerk's transcript. We say that the fifth amended complaint "appears to have been" the operative complaint because the parties assured the court at oral argument that it was. However, the joint appendix, which includes no register of actions, provides no confirmation. This omission is but one of the many deficiencies in the joint appendix. For example, we are unable to ascertain with certainty the provisions of the Golden Eagle insurance policies issued to Rampart. A portion of what appears to be a CGL policy is contained in the joint appendix and labeled "Exhibit 19." It contains no names or dates. The joint appendix contains no tabs, and consists mainly of numerous exhibits, many of which themselves contain documents with multiple exhibits appended. Working our way back through the exhibits from number 19, we find a declaration of Timothy Gonzales (joint appendix at p. 2802), which authenticates exhibits 1 through 6, but makes no mention of the remaining exhibits, which occupy another four volumes of the joint appendix. This manner of compiling the relevant documents, without a useful table of contents or tabs to navigate by, renders the record nearly impenetrable. While the joint appendix may comply with the minimum requirements of California Rules of Court, rule 9(a) and (b) (requiring that the contents be chronological and indexed) because it sets forth the motions in the order in which they were filed with the liquidation court, it hardly facilitates appellate review of the extensive proceedings below.

reported, "I just made a telephone call to Golden Eagle. I talked to the persons of authority. And they are choosing not to intervene in this case." The trial court replied, "So then, you're excused. I don't think we have another choice. Do we?" Counsel for Rampart replied, "I don't think so, your Honor."

The matter proceeded to trial without participation by Rampart or Golden Eagle. Over the course of the ensuing five-day trial, the court heard testimony from the claimants, who described the problems with the fireplaces and adverse effects on their health. The court also heard from an architect who testified that the fireplaces were a fire hazard and needed to be replaced. The expert also testified as to the cost of removing and replacing fireplaces in homes in which construction had been completed. An attorney for Lyon testified about the contracts between Lyon and the subcontractors, including Rampart. A general contractor testified as an expert on damages.

The court questioned the architect, the general contractor, and the attorney for Lyon, as well as some of the claimants. Attorneys for the other remaining subcontractor defendants also questioned most of these witnesses, in part about damages caused by the defective fireplaces.

The trial court found that Rampart was liable for part of the damages, and on July 9, 1996, entered a judgment against it in the amount of $1,323,524.27. This amount consisted of $283,322.33 for resulting property damage, $213,500.00 for personal injury, $540,000.00 for "damages as assignees of Lyon," and $286,700.94 in costs. Almost six months later, on December 30, 1996, Golden Eagle moved to set aside the underlying judgment under Code of Civil Procedure section 473, and sought leave to intervene. The motion was denied, and that decision was not challenged on appeal.

Claimants then filed suit against Golden Eagle under Insurance Code section 11580 (hereafter, section 11580) seeking to recover the judgment. In January 1997, "the Insurance Commissioner seized Golden Eagle and instituted conservation proceedings. In August 1997, the San Francisco County Superior Court issued an order approving Golden Eagle's rehabilitation plan. Pursuant to the rehabilitation plan, the newly created Golden Eagle Insurance Corporation (GEIC) was responsible for 'covered' claims arising under the insurer's policies, and the Golden Eagle Liquidating Trust (GELT) was established to administer 'uncovered' claims (such as claims for extra-contractual damages or bad faith) pending against the company. The San Francisco County Superior Court retained jurisdiction to supervise the rehabilitation plan and adjudicate all third party claims asserted against Golden Eagle and the liquidating trust. Accordingly, the court adopted procedures for adjudicating orders to show cause arising from the rejection by GEIC or

GELT of covered and uncovered claims." (*Low v. Golden Eagle Ins. Co.* (2002) 101 Cal.App.4th 1354, 1359 [125 Cal.Rptr.2d 155] (*Low I*).) As there is no need to distinguish for the purposes of this opinion, we refer to both Golden Eagle Insurance Company and Golden Eagle Insurance Corporation as Golden Eagle. In September 1997, claimants filed a proof of claim in the conservation proceedings. The claims administrator declined to consider the judgment against Rampart, citing Insurance Code section 1028 (hereafter section 1028), and instead requested evidence from claimants to support the amount of their claim. Ultimately, the claims administrator determined that under the policy, claimants were entitled to recover only $3,338.54. However, the administrator decided to pay claimants $65,000.00, the amount that Golden Eagle had offered in a settlement proposal submitted under Code of Civil Procedure section 998.

On February 22, 2000, claimants applied to the court in the liquidation proceedings for an order to show cause why their claim should not be allowed in the full amount of the underlying judgment. The claims administrator opposed the order to show cause, and on March 7, 2001, the court entered an order finding that the claims administrator was precluded from challenging the amount of the award against Rampart because the underlying judgment was binding, but that it could dispute whether the awarded damages were covered by the Golden Eagle policies. The court also found that Golden Eagle did not act in bad faith when it failed to pay the judgment against Rampart. The court therefore denied claimants' request for punitive damages.

Claimants filed a motion asking for a declaration that the judgment was covered under the Golden Eagle policies. In that motion, claimants asserted that despite the previous order "and the lapse of four months, [Golden Eagle] still refuses to pay any of the categories" of damages that had been awarded by the trial court. In its second order, dated November 9, 2001, the court declined the administrator's invitation to reconsider its earlier ruling. It then ruled that Golden Eagle had not waived its coverage defenses; that the "resulting property damage" was not covered under the terms of the Golden Eagle policies; that portions of the personal injury damages were recoverable but that $35,000 included in the personal injury award for loss of use of property was not covered; that claimants as assignees of Lyon were "entitled to reimbursement from Golden Eagle for their fair share of indemnity and defense costs under all policies" but that Rampart should be deemed responsible for only 30 percent of these costs, rather than the 60 percent apportioned to it by the trial court; and finally, that claimants were entitled to recover their own costs of suit including their attorney fees.

DISCUSSION

## 1. *Standard of review*

"Because the insurer is in liquidation, the scope of our review of determinations of both the superior court and the liquidation trustees in the resolution of claims by insureds against an insolvent carrier is circumscribed. (See generally, Ins. Code, §§ 1010–1062.) Our high court has long since observed that such conservation proceedings arise under the broad police powers of the state to insure the reorganization or orderly liquidation of insolvent insurers and the protection of their policyholders and the public. [Citation.] A corollary of that broad power is the judiciary's limited scope of inquiry into the liquidation trustees' grounds for rejecting claims for compensation by policyholders. As the *Carpenter* [*v. Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 329 [74 P.2d 761]] court put the ruling standard, 'The only restriction on the exercise of this power [to administer liquidation proceedings under the Insurance Code] is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory.' (*Ibid.*) [¶] That seminal formulation has since been glossed repeatedly to mean the measure of judicial review in such proceedings is the familiar 'abuse of discretion' standard. [Citations.]" (*Low v. Golden Eagle Ins. Co.* (2002) 104 Cal.App.4th 306, 315–316 [128 Cal.Rptr.2d 423] (*Low II*).) Our review of the liquidation court's factual determinations is likewise circumscribed. (*Low v. Golden Eagle Insurance Co.* (2003) 110 Cal.App.4th 1532, 1544 [2 Cal.Rptr.3d 761] (*Low III*).)

"However, '[a]n administrative determination will be interfered with by the courts where the determination is based upon an error in law. [Citation.] It is for the courts, not for administrative agencies, to lay down the governing principles of law. Accordingly, questions of law are reviewable. [Citation.] Whether an administrative agency applies the legislative standards validly set up, and whether it acts within the authority conferred or goes beyond it, are proper questions for judicial decision. [Citation.] The matter of statutory construction is not finally entrusted to administrative agencies; it is determined ultimately by the courts. [Citation.]' " (*Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112].)

## 2. *Collateral attack on the underlying judgment*

The first argument advanced by the claims administrator for Golden Eagle is that the liquidation court's ruling that the underlying judgment should be considered to evidence Rampart's liability violates section 1028, which precludes consideration in the insurer's liquidation proceedings of a judgment taken by default or collusion. However, for clarity of analysis, it is preferable

to consider first the validity of the underlying judgment entered against Rampart, then the extent to which Golden Eagle would have been bound by that judgment if it had not gone into liquidation proceedings, before turning to the effect of section 1028 on the enforceability of the claim in the liquidation proceedings. Claimants of course were not entitled to recover more from Golden Eagle than they were entitled to recover from Rampart, and they may not recover more in the liquidation proceedings than they were entitled to recover directly from Golden Eagle.

### a. *The validity of the underlying judgment against Rampart*

The claims administrator argues that because the complaint against Rampart alleged damages of only $125,000, plus other unspecified amounts, under Code of Civil Procedure section 580 the trial court could not enter a valid judgment for more than $125,000.[2] The administrator reasoned that because Rampart did not participate in the trial, the judgment is akin to a default judgment and claimants therefore are limited to the amount demanded in the complaint. Although there is some merit to this argument to the extent that due process considerations apply, we disagree that Code of Civil Procedure section 580 governs this situation.

Section 580 of the Code of Civil Procedure provides, "The relief granted to the plaintiff, if there is no answer, cannot exceed that which he or she shall have demanded in his or her complaint, in the statement required by Section 425.11 [of the Code of Civil Procedure] . . . ; but in any other case, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue." Before entering default in a case involving personal injury, the plaintiff must serve the defendant with a statement of the nature and amount of damages sought. (Code Civ. Proc., § 425.11, subds. (b) & (c); *Parish v. Peters* (1991) 1 Cal.App.4th 202, 210 [1 Cal.Rptr.2d 836] ["to protect the due process rights of defendants while allowing personal injury plaintiffs to seek default judgments against runaway defendants, we must hold as a matter of constitutional law that the equivalent of a section 425.11 statement of damages be served in the same manner as a summons prior to entry of a default judgment against a defendant served by publication"].) "The purpose of section 425.11 is to ' "give defendants 'one last clear chance' to respond to allegations of complaints by providing them with 'actual' notice of their exact potential liability. [Citation.]" ' " (*Scognamillo v. Herrick* (2003) 106 Cal.App.4th 1139, 1147 [131 Cal.Rptr.2d 393].)

---

[2] The claims administrator in fact suggests that the underlying judgment against Rampart could not exceed approximately 30 percent of this amount, 30 percent being the portion of claimants' damages that the liquidation court attributed to Rampart.

The statutes dealing with entry of default judgment "ensure that a defendant who declines to contest an action does not thereby subject himself to open-ended liability. Reasoning that a default judgment that exceeds the demand would effectively deny a fair hearing to the defaulting party, the Courts of Appeal have consistently read the code to mean that a default judgment greater than the amount specifically demanded is void as beyond the court's jurisdiction." (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 826 [231 Cal.Rptr. 220, 726 P.2d 1295].) "The notice requirement of [Code of Civil Procedure] section 580 was designed to insure fundamental fairness. Surely, this would be undermined if the door were opened to speculation, no matter how reasonable it might appear in a particular case, that a prayer for damages according to proof provided adequate notice of a defaulting defendant's potential liability." (*Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 494 [165 Cal.Rptr. 825, 612 P.2d 915].)

■ Code of Civil Procedure section 580 places a limit on the amount of recovery only in the event that "there is no answer" and a default judgment is entered against the defendant. As discussed more fully below in considering the claims administrator's argument under Insurance Code section 1028, Rampart did file an answer and actively defended claimants' claims until the start of trial. When it ceased to participate, the trial court nonetheless considered the evidence in proceedings in which the other interested parties actively participated before entering judgment against Rampart and the two other subcontractors. The resulting judgment against Rampart was not entered by "default."[3] As long as Rampart's answer remained on file, the court lacked the authority to enter its default. Rampart's failure to appear for trial after having received proper notice of the trial date authorized the entry of judgment against it under Code of Civil Procedure section 594, following an "uncontested" evidentiary hearing, but it did not authorize the entry of a default judgment. (*Merrifield v. Edmonds* (1983) 146 Cal.App.3d 336, 341 [194 Cal.Rptr. 104]; see *Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 862–864 [121 Cal.Rptr.2d 695].) We therefore reject the claims administrator's contention that Code of Civil Procedure section 580 limited the judgment that the trial court could validly enter against Rampart to $125,000.

Nonetheless, as suggested above, Code of Civil Procedure sections 425.11 and 580 are grounded upon considerations of due process. (See *Finney v. Gomez* (2003) 111 Cal.App.4th 527, 535 [3 Cal.Rptr.3d 604] ["The notice requirements of due process lie at the core of section 580"]; *Parish v. Peters*,

---

[3] The fact that the minute order prepared by the courtroom clerk referred to a "default judgment" has no significance. The term did not appear in any order or other document signed by the trial judge. The minute order simply reflects that the clerk, like the claims administrator, failed to appreciate the distinction between a default judgment entered pursuant to Code of Civil Procedure sections 580 and 585 and a judgment entered after an uncontested hearing pursuant to Code of Civil Procedure section 594.

*supra,* 1 Cal.App.4th 202, 207 ["Section 580 constitutes a statutory expression of the mandates of due process, which require 'formal notice of potential liability' "]; *Petty v. Manpower, Inc.* (1979) 94 Cal.App.3d 794, 798 [156 Cal.Rptr. 622].) If the eventual judgment exceeded the amount that Rampart had been given notice was at risk in the litigation, the constitutional mandate of due process would void the excess, even if Code of Civil Procedure section 580 did not. (*Finney v. Gomez, supra,* 111 Cal.App.4th at p. 544.)

■ The fact that the precise amount of the requested damages was not specified in the complaint does not mean that the resulting judgment necessarily resulted in a deprivation of due process of law. The key elements of procedural due process are notice and an opportunity to be heard.[4] " 'The fundamental requisite of due process of law is the opportunity to be heard.' [Citation.] This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. [¶] . . . [¶] An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information, [citation], and it must afford a reasonable time for those interested to make their appearance." (*Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 70 S.Ct. 652].)

Both the claimants' complaint and undoubtedly the discovery in which Rampart participated prior to withdrawing from the action made clear that claimants were seeking to recover more than $125,000 for their own property damages and for the damages they were seeking to recover as Lyon's assignee. As acknowledged by the litigation supervisor at Golden Eagle who was responsible for the underlying litigation, Rampart defended the action for three and a half years with counsel provided by Golden Eagle. During that period, Rampart's attorney deposed each of the claimants and participated in the issues conference meeting immediately preceding the start of trial. Although we have found no reported cases in California in which a defendant appeared in an action, did not participate in the trial, and then objected to the award on due process grounds because it exceeded the demand in the complaint, *In re Genesys Data Technologies, Inc.* (Hawaii 2001) 95 Haw. 33 [18 P.3d 895] is instructive. In that case, the defendant had appeared in the

---

[4] Due process demands only that litigants have the *opportunity* to be heard, not that they avail themselves of that opportunity. "The due process rights to notice and hearing prior to a civil judgment are subject to waiver." (*D. H. Overmyer Co. v. Frick Co.* (1972) 405 U.S. 174, 185 [31 L.Ed.2d 124, 92 S.Ct. 775] [company knowingly waived its right to due process when it signed a note containing a cognovit clause].)

action and participated in discovery. Default judgment in excess of the amount specified in the complaint was later entered against the defendant. The court upheld the award on the ground that defendant "was provided with sufficient notice of the actual amount of damages sought and an opportunity to defend against it prior to the entry of judgment." (*Id.* at p. 905.)

Analogously, in *Castaic Clay Manufacturing Co. v. Dedes* (1987) 195 Cal.App.3d 444 [240 Cal.Rptr. 652], decided shortly after the Supreme Court decision in *Greenup v. Rodman, supra,* 42 Cal.3d 822, the court upheld an award of damages that exceeded the demand in the complaint against a defendant who participated in the trial. The court reasoned that "[t]he parties thus actually tried the issues of damages in amounts above the limits set forth in the body of the complaint. The amount of the trial court's judgment on those issues therefore could not have come as any surprise to defendant and was the source of no prejudice to him since no additional time or effort by him was required to meet those issues." (195 Cal.App.3d at p. 450.) The court affirmed the award even though plaintiff failed to amend the complaint to conform to the proof at trial. (*Ibid.*)

Finally, in *Low I, supra,* 110 Cal.App.4th 1534, this court held that the damages an intervening subrogee, Allstate Insurance Company, could recover from Golden Eagle were not limited by the $25,000 amount that the plaintiffs in the underlying action had pleaded in their complaint. When plaintiffs obtained a default judgment against Golden Eagle's insured, their damages were capped at $25,000. However, "Allstate's complaint-in-intervention put [Golden Eagle's insured] on notice that the actual damages were much greater . . . . Thus, allowing Allstate to recover the full amount of its subrogation default judgment does not frustrate the purpose of the rule limiting the amounts recoverable in default judgments. Under the contrary view urged by GEIC, a defaulting party who had actual notice could hide behind one plaintiff's pleading flaw to avoid paying the full extent of damages claimed by another. Such a result would be inconsistent with the fundamental fairness rationale underlying Code of Civil Procedure section 580." (*Low I, supra,* at pp. 1363–1364, fn. omitted.)

Nonetheless, there were two components of the judgment entered against Rampart that the record indicates were beyond the apparent scope of the pleadings when Rampart withdrew (and Golden Eagle failed to intervene): personal injury damages and claimants' attorney fees. The fifth amended complaint was filed August 9, 1995, nearly a year before the case proceeded to trial. The first and third causes of action are for express and implied contractual indemnity on rights assigned from Lyon, alleging that Lyon and its insurance carrier, National Union Insurance Company (National Union), incurred "attorneys' fees, court costs, and the expenses of this action." The

second cause of action is for express contractual indemnity on rights assigned from National Union, alleging that National Union incurred "attorneys' fees, court costs and the expenses of this action." The fourth cause of action is for negligence for faulty construction of the homes, alleging that claimants suffered "economic damages, including property damage." The fifth cause of action is for breach of implied warranty for faulty construction of the homes, alleging that claimants suffered "resulting damage to their property." The prayer for the first three causes of action requests $125,000, plus fees, costs and prejudgment interest. For the fourth and fifth causes of action, the prayer requests "all expenses incurred and necessary to repair Plaintiffs' property as a result of Defendants' defective construction," costs, and prejudgment interest.

Because the operative complaint at the time of trial contained no allegations of personal injury, Rampart had no reason to anticipate liability for such when it failed to reactivate its corporate status in order to defend the action, nor did Golden Eagle when it declined to intervene. Rampart had no reason to seek discovery on the subject, lacking any indication from the complaint that personal injuries were at issue. Although earlier versions of the complaint made reference to physical injuries, the claimants dropped these allegations at least a year prior to trial. Rampart's attorney declared that "My office took the deposition of the plaintiffs in this action, and until the time of trial, personal injury damages were not an issue. Consequently, I was surprised to learn that plaintiffs were awarded $213,500 in 'personal injury damages.' " (Declaration of Rodney J. Hahn, *supra*, joint appendix at p. 1154.) Therefore, imposing liability for personal injury damages on these parties without notice that such damages were being claimed would deprive them of due process, and the judgment that purported to do so is to that extent void. (*Becker v. S.P.V. Construction Co., supra*, 27 Cal.3d at pp. 494–495 [default judgment exceeding amount of damages alleged in complaint modified to eliminate the excess which court had no jurisdiction to award]; *Molen v. Friedman* (1998) 64 Cal.App.4th 1149, 1156–1157 [75 Cal.Rptr.2d 651].)

For the same reason, the portion of the award that was attributable to claimants' attorney fees is also void.[5] As part of their recoverable costs, the trial court awarded claimants $147,285.50 in attorney fees. However, the operative complaint gave Rampart no notice that claimants would seek to recover their attorney fees. The amended complaint did not allege the existence of an agreement that the prevailing party recover its attorney fees (which in all events was improbable since the claimants entered into no agreements with the subcontractors that worked on their homes), nor did it allege

---

[5] Claimants' attorney fees are to be distinguished from the attorney fees incurred by or on behalf of Lyon, which claimants were entitled to recover as assignees of Lyon. The recovery of Lyon's attorney fees was clearly within the scope of the fifth amended complaint.

any other facts that would have entitled them to recover attorney fees, and there was no request for such fees in the prayer.

 Hence, the trial court in the underlying action was without jurisdiction to award claimants $213,500.00 in personal injury damages and $147,285.50 in attorney fees as part of their costs. Therefore these amounts must not be included in claimants' recovery in the liquidation proceedings.

 b. *Section 11580*

Claimants contend that under section 11580, they would have been entitled to recover the full amount of the underlying judgment from Golden Eagle, without offering any further evidence of the validity of their claim against Rampart.[6] Although for the reasons we have just explained, portions of the judgment are void, and therefore necessarily were not recoverable from Golden Eagle under section 11580, claimants are correct as to the remaining valid portions of the underlying judgment.

 "In the usual situation a plaintiff in a personal injury action has no direct cause of action against the defendant's liability insurer. Insurance Code section 11580, however, requires that contracts of insurance contain a provision that an action may be brought directly against the insurer on a *judgment* obtained against the insured for death, bodily injury or property damage. The purpose of such a provision is to protect injured parties against the insolvency of the *insured*." (*Biggs v. California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 645 [179 Cal.Rptr. 16] (*Biggs*).) Because it may be sued directly under section 11580, when the corporate status of its insured has been suspended, the insurer has the right to intervene in litigation against the insured to protect its interests. (*Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 387 [100 Cal.Rptr.2d 807].)

Under section 11580, claimants would have been entitled to recover from Golden Eagle on their judgment regardless of whether Golden Eagle had

---

. [6] Section 11580 in pertinent part provides: "A policy insuring against losses set forth in subdivision (a) shall not be issued or delivered to any person in this state unless it contains the provisions set forth in subdivision (b). Such policy, whether or not actually containing such provisions, shall be construed as if such provision were embodied therein. [¶] (a) Unless it contains such provisions, the following policies of insurance shall not be thus issued or delivered: [¶] (1) Against loss or damage resulting from liability for injury suffered by another person . . . . [¶] (2) Against loss of or damage to property caused by draught animals or any vehicle, and for which the insured is liable . . . . [¶] (b) Such policy shall not be thus issued or delivered to any person in this state unless it contains the following provisions: [¶] . . . [¶] (2) A provision that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment."

actual notice of the amount demanded in the litigation. In order to recover on the judgment in an action brought under section 11580, claimants would merely have had to plead and prove that: "1) [they] obtained a judgment for bodily injury, death, or property damage, 2) the judgment was against a person insured under a policy that insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal, 3) the liability insurance policy was issued by the defendant insurer, 4) the policy covers the relief awarded in the judgment, [and] 5) the policy either contains a clause that authorizes the claimant to bring an action directly against the insurer or the policy was issued or delivered in California and insures against loss or damage resulting from liability for personal injury or insures against loss of or damage to property caused by a vehicle or draught animal." (*Wright v. Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1015 [14 Cal.Rptr.2d 588].)

■ We consider in part 3, *post*, whether Golden Eagle was precluded from contesting coverage and the extent to which its policies provided coverage. Assuming, arguendo, that Golden Eagle is precluded from asserting its coverage defenses, or that coverage existed, claimants would have been entitled to prevail in a suit against Golden Eagle under section 11580. Each of the elements articulated in *Wright* is present. In an action under section 11580, Golden Eagle would have had no right to relitigate the issues of damages or liability, but would have been bound by the amount of the valid judgment against its insured. (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 886 [151 Cal.Rptr. 285, 587 P.2d 1098].) In *Clemmer,* Hartford Insurance Company's insured killed Dr. Clemmer. The doctor's widow and son sued Hartford's insured and obtained a default judgment, which they then sought to satisfy by an action under section 11580 against Hartford. The trial court rejected Hartford's attempt to challenge the amount of damages awarded in the default judgment, and that ruling was affirmed on appeal. The court held that although Hartford was not a party to the underlying litigation against its insured, it "received the kind of 'notice . . . of the pendency of the [wrongful death] action' which should result in its being bound by the amount of damages found in that action to have been sustained by plaintiffs." (*Clemmer v. Hartford, supra,* at p. 884.) The court found that Hartford had sufficient notice despite the fact that it was first aware of the pendency of the action "when, on the day before the hearing on default judgment following [the insured's] default, it was notified of that hearing by a telephone call and telegram from plaintiffs' attorney." (*Ibid.*) The court reasoned that Hartford could have moved to set aside the judgment under Code of Civil Procedure section 473, but had failed to do so. The court concluded: "Thus, under the circumstances, we hold that Hartford had ample opportunity to seek an adjudication of the damages. It knew or should have

known that judgment against its insured would form the basis for a later claim against it under Insurance Code section 11580. Instead of protecting itself by means of a [Code of Civil Procedure] section 473 motion it chose to remain silent, resting on its claim of noncoverage. Having failed to pursue remedies thus available to it, it cannot now claim prejudice or lack of opportunity to litigate damages." (*Clemmer v. Hartford, supra,* at p. 886.)

Numerous additional authorities support the conclusion that under section 11580 Golden Eagle was obligated for the full amount of the valid judgment against Rampart covered by its policies. To be enforceable against an insurer, a "judgment need not be based on a contested or adversarial trial, but may rest upon a default hearing held following a settlement [citations] or an uncontested trial where the insured settled with the claimant and thereafter presented no defense. [Citation.] These circumstances necessarily involve significant independent adjudicatory action by the court, thus mitigating the risk of a fraudulent or collusive settlement between an insured and the claimant. Final judgments entered under either of these circumstances are binding on the insurer which has wrongfully abandoned its insured . . . . [¶] There is a sound reason why this should be so. The insurer not only had a right to participate in and to control the litigation, it had a duty to do so. An insurer which has wrongfully abandoned its insured should not be heard to complain or allowed to relitigate the trial court's judgment merely because the default or uncontested proceedings followed, and were related to, an agreement between the insured and the claimant. Whatever the terms of the settlement, the entry of judgment was based on an independent review and adjudication of the evidence by the trial court. An insurer which has breached its contract is properly bound by the result of such trial proceedings . . . ." (*Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 516–517 [42 Cal.Rptr.2d 295]; see also *Schaefer/Karpf Productions v. CNA Ins. Companies* (1998) 64 Cal.App.4th 1306, 1313 [76 Cal.Rptr.2d 42] ["It is well-settled an insurer who is on notice of an action against its insured and refuses to defend on the ground the alleged claim is not within the policy coverage is bound by a judgment in the action, absent fraud or collusion, 'as to all material findings of fact essential to the judgment of liability [and damages] of the insured.'" (Italics omitted.)]; *National Union Fire Ins. Co. v. Lynette C.* (1994) 27 Cal.App.4th 1434 [33 Cal.Rptr.2d 496] (*Lynette C.*).[7])

---

[7] *Lynette C., supra,* 27 Cal.App.4th 1434, not only provides strong support for our conclusion regarding the application of section 11580, but it also provides a thorough discussion of a related issue that was not raised explicitly in the present case. The CGL policies issued by Golden Eagle appear to have included a clause similar to that in *Lynette C.,* providing that "A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after *an actual trial* . . . ." (Italics added.) In *Rose v. Royal Ins. Co.* (1991) 2 Cal.App.4th 709 [3 Cal.Rptr.2d 483], such a "no action" clause, requiring an "actual trial," was held to be consistent with the terms of section 11580. In *Lynette C.,* the court held that in reviewing the "decisions issued in the wake of the *Wright* and *Rose*

■ The reasoning of these authorities is even more persuasive in the present situation, since Golden Eagle overtly declined to participate in the underlying litigation. Rampart satisfied its obligation under the governing insurance polices to timely notify Golden Eagle of the suit brought against it, and Golden Eagle has never claimed otherwise. Golden Eagle had ample notice of the action and opportunity to defend its interests. Indeed, counsel appointed by Golden Eagle to represent Rampart participated in the litigation up to the eve of trial. Presumably extensive discovery took place in the course of the litigation,[8] and Golden Eagle knew or readily could have ascertained the amount of exposure it faced in the litigation.[9] Although Golden Eagle ultimately moved to have the judgment set aside under section 473 of the Code of Civil Procedure, the motion was denied and Golden Eagle neither appealed from that denial nor does it challenge that ruling in this appeal. Thus, to the extent that the judgment that claimants obtained against Rampart was within the scope of the underlying action when Rampart's participation ceased and Golden Eagle chose not to intervene, Golden Eagle is accountable for that judgment under section 11580. Under the doctrine of collateral estoppel, Golden Eagle was not entitled to relitigate those issues that were litigated in the underlying action. (See *Lynette C., supra,* 27 Cal.App.4th at p. 1453.)

---

opinions, it is apparent that a trial does not have to be adversarial to be considered an 'actual trial' under the 'no action' clause, or to be considered binding against the insurer in a section 11580 proceedings. [Citation.] In deciding whether a judgment involving the injured party and the insured is binding on the insurer, courts focus on whether the facts have been adjudicated independently in a process that does not create the potential for abuse, fraud or collusion." (27 Cal.App.4th at p. 1449, citing *Wright v. Fireman's Fund Ins. Co., supra,* 11 Cal.App.4th 998 and *Rose v. Royal Ins. Co., supra,* 2 Cal.App.4th 709.)

[8] California's discovery process allows for discovery of all relevant material and is designed to eliminate the element of surprise. (Code Civ. Proc., § 2017; *Fairmont Insur. Co. v. Superior Court* (2000) 22 Cal.4th 245, 253, fn. 2 [92 Cal.Rptr.2d 70, 991 P.2d 156].) "For discovery purposes, information is relevant if it 'might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement . . . .' [Citation.] Admissibility is not the test and information unless privileged, is discoverable if it might reasonably lead to admissible evidence. [Citation.] These rules are applied liberally in favor of discovery [citation], and (contrary to popular belief), fishing expeditions are permissible in some cases." (*Gonzalez v. Superior Court* (1995) 33 Cal.App.4th 1539, 1546 [39 Cal.Rptr.2d 896], italics omitted.)

[9] If counsel failed to apprise Golden Eagle of its exposure in the litigation, Golden Eagle may have recourse against the attorney, but may not escape the obligations to its insured. (See, e.g., *California State Auto. Assn. Inter-Ins. Bureau v. Parichan, Renberg, Crossman & Harvey* (2000) 84 Cal.App.4th 702, 713–714 [101 Cal.Rptr.2d 72], disapproved on other grounds in *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1244, fn. 5 [135 Cal.Rptr.2d 629, 70 P.3d 1046] [where attorneys' failure to keep insurance company apprised of the status of litigation resulted in a bad faith judgment against the insurer, insurer could recover amount of settlement from attorneys]; *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229 [45 Cal.Rptr.2d 565] [where attorney failed to plead a defense that would have absolved insured of liability, insurer settled claim and had standing to recover settlement amount from attorney in a malpractice action].)

For this reason, we see no basis for the liquidation court to have reduced claimants' recoverable damages as assignees of Lyon from 60 percent to 30 percent of the developer's costs. The claims administrator attacks the allocation made by the trial court on various grounds. Whatever the merits of its contentions, the fact remains that the trial court in the underlying action allocated 60 percent of $900,000 to Rampart. Any reduction in this percentage necessarily implies that a greater percentage should have been allocated to some other party, which the liquidation court obviously was not in a position to do. This simply illustrates the undesirable consequences that would follow if the liquidation court were permitted to redetermine the merits of the underlying action. The determination of the trial court in the underlying action was binding on Rampart and, as indicated above, Golden Eagle was collaterally estopped to challenge that apportionment when recovery was sought under section 11580. (See *Lynette C., supra,* 27 Cal.App.4th at p. 1453.) Unless Insurance Code section 1028 required the liquidation court to disregard the underlying judgment, the liquidation court was not free to reallocate Lyon's damages in a manner it considered more equitable.[10]

c. *Insurance Code section 1028*

■ The principal argument of the claims administrator is that the liquidation court erred in concluding that section 1028 did not preclude the administrator from considering the underlying judgment as evidence of Golden Eagle's liability in the liquidation proceedings. The right to recover directly against a judgment debtor's insurer is limited when the insurer is in insolvency proceedings. Although recovery is permitted on most judgments entered against the insured under section 11580, "[a] judgment taken by default, or by collusion, against an insured shall not be considered as evidence, in the liquidation proceeding, either of the liability of such insured to such claimant upon such cause of action or of the amount of damages to which such claimant is entitled." (§ 1028.)

In this case, the claims administrator refused to consider the underlying judgment in valuing the claim against Golden Eagle. It did so on the ground that section 1028 precluded such consideration because "the judgment was a default judgment within the meaning of § 1028 . . . ." The claims administrator cited to a minute order from the trial court that stated, "Judgment entered for plaintiffs and against Rampart General by default (as defendant Rampart General did not appear at trial) as stated into the record." (See fn. 3, *ante.*)

---

[10] In holding that the liquidation court could not properly redetermine the amount claimants were entitled to recover from Rampart, we do not speak to whether these damages were covered under the Golden Eagle policies. We conclude in part 3b.ii, *post,* that these damages were not covered by the Golden Eagle policies so that claimants may not recover them unless Golden Eagle is estopped from asserting its coverage defenses.

The claims administrator concluded that "The purpose behind § 1028 is clear. In a liquidation proceeding, uncontested judgments are not to be given any evidentiary value. The fact that one or more codefendants showed up for trial does nothing toward establishing the claim against the insured was resolved on the merits or raise the dignity of the proceeding to anything more than a default prove up."

■ The determination of the claims administrator that a judgment entered after an uncontested hearing under Code of Civil Procedure section 594 constitutes a judgment taken by default within the meaning of section 1028 is a legal conclusion that was appropriately considered de novo by the liquidation court. (*Quackenbush v. Mission Ins. Co., supra,* 46 Cal.App.4th at p. 466.) The liquidation court did so and rejected the administrator's interpretation of the statute. The court concluded that the intent behind section 1028 is to protect insolvent insurance companies from judgments obtained by collusion or fraud. It noted that "the trial judge's involvement in the fact-finding process in a trial proceeding in open court, albeit limited, was a sufficient safeguard against the concerns of Section 1028 regarding collusion and fraud." We likewise must consider the meaning of the statute de novo, and we reach the same conclusion as did the liquidation court. The statute does not automatically disqualify from consideration as evidence of liability a judgment entered after an "uncontested" hearing under Code of Civil Procedure section 594.

Although section 1028 was enacted in 1935, no reported appellate decision has interpreted this provision. However, courts have interpreted an analogous statute that applies to the California Insurance Guarantee Association (CIGA). "CIGA is an association created by statute (Ins. Code, § 1063) to which insurance carriers are required to belong as a condition of doing business in California . . . . Its primary objective is to provide insurance against 'loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies.' " (*Biggs, supra,* 126 Cal.App.3d at p. 644.) CIGA is expressly forbidden to pay all claims of the insurer, but may pay only those that are "covered claims." (*Reed v. California Ins. Guarantee Assn.* (1988) 200 Cal.App.3d 1269, 1275 [246 Cal.Rptr. 561] (*Reed*).) Just as default judgments or judgments entered collusively may not be considered as evidence of the liability of the insurer when the insurance company is in liquidation, Insurance Code section 1063.2, subdivision (g) provides that for CIGA, no "default judgment . . . against the insolvent insurer, or against the insured of the insolvent insurer, [shall] be binding against the association." "The clear purpose of the statutory language is to protect CIGA against collusion and to require simply that the validity of any claim be determined in an adversary setting before being reduced to a judgment which CIGA must honor." (*Biggs, supra,* 126 Cal.App.3d at p. 645.)

In both *Reed* and *Biggs*, the courts found that the judgments involved were not covered claims within the meaning of Insurance Code section 1063.2 because they had been taken by default. In *Reed*, the plaintiff had default entered against the defendant. When the defendant learned of the action, he contacted plaintiff's attorney, who advised the defendant's insurance company of the suit. The next day, the insurer was adjudicated insolvent and CIGA stepped in to liquidate its affairs. CIGA notified the plaintiff that unless he agreed to set aside the existing default, CIGA would maintain that the claim was not covered, and it then brought a motion to set aside the default. Plaintiff settled the matter directly with the defendant for 10 times the policy limits in exchange for plaintiff's promise not to execute against the defendant's personal assets and defendant's assignment to plaintiff of any causes of action against the insurer. Plaintiff and defendant entered into a stipulated judgment with these terms. The plaintiff then sought declaratory relief against the insurer based on the judgment, which the trial court denied in part because the claim against defendant upon a stipulated judgment was not a covered claim. The Court of Appeal agreed, concluding that "the stipulated judgment in the underlying action is in this case the functional equivalent of a default judgment. Since [defendant's] default had been entered when CIGA came into the picture, all the stipulation accomplished was to relieve [plaintiff] of the necessity to prove up the default. In effect, the stipulation was for entry of a default judgment." (*Reed, supra*, 200 Cal.App.3d at p. 1277.)

In *Biggs*, the plaintiff filed suit against her employer for a personal injury. Almost two years after the suit was filed, the employer's insurance company was declared insolvent and CIGA undertook defense of the suit. Approximately a year later, the employer's corporate powers were suspended for failure to pay corporate franchise taxes. Plaintiff then brought a motion to strike the answer, which the trial court granted, and plaintiff obtained a default judgment. CIGA refused to pay the judgment and plaintiff sued for declaratory relief. CIGA prevailed and the Court of Appeal affirmed, holding that Insurance Code section 1063.2 barred recovery by plaintiff on the default judgment. Plaintiff argued that CIGA should have paid the employer's taxes so that it could have continued to defend the action. The court disagreed that CIGA had any such obligation and pointed out that plaintiff could have waived the incapacity of the insured, allowed CIGA to defend the action, and obtained a judgment that would have been enforceable. (*Biggs, supra*, 126 Cal.App.3d at p. 646.)

The facts of this case are markedly different from those in *Reed* or *Biggs*. Here, the trial court invited the then-solvent Golden Eagle to intervene in the action to defend its interests, and Golden Eagle declined. Had Golden Eagle remained viable, claimants could have enforced the judgment against it under section 11580. Claimants attempted to avoid the precise problem that has arisen. When claimants' counsel announced prior to trial that they were

prepared to waive Rampart's lack of corporate capacity and stipulate that Rampart or Golden Eagle could appear, Rampart's counsel stated "we made it clear that we were following good California authority," and cited to *Biggs*.

Under these circumstances, it is the dicta in *Biggs* that is highly persuasive: "Finally we must dispel the notion advanced by plaintiff that our conclusion will permit CIGA in the future to simply *refuse to defend* any insurer and thus force all claimants to obtain summary judgments which are not binding on CIGA. [¶] We are not here confronted with the situation in which CIGA, having the opportunity to do so, simply refused to defend the insured of an insolvent insurer. Were that the case we would have no trouble in holding that such refusal would estop CIGA from later refusing to pay on the grounds that the judgment was taken by default." (*Biggs, supra,* 126 Cal.App.3d at p. 647, italics added.)

Moreover, claimants did not have Rampart's answer stricken and obtain a judgment by default, but they proceeded to a trial on the merits. Contrary to the administrator's characterization of the claimants' argument, section 1028 is not inapplicable merely "because the judge who rendered the uncontested judgment did not perform a ministerial act of striking the defendant's answer before issuing the judgment," but because the trial judge independently adjudicated those facts despite the uncontested nature of the proceedings. (*Lynette C., supra,* 27 Cal.App.4th at p. 1449.) As explained above, there is a marked difference between a judgment entered by default, pursuant to Code of Civil Procedure section 585, and a judgment entered after an uncontested hearing under Code of Civil Procedure section 594. (*Merrifield v. Edmonds, supra,* 146 Cal.App.3d at p. 341; *Heidary v. Yadollahi, supra,* 99 Cal.App.4th at pp. 862–864; *Wilson v. Goldman* (1969) 274 Cal.App.2d 573, 577, fn. 1 [79 Cal.Rptr. 309] ["The idea that all that remains to be done [in an uncontested hearing under Code of Civil Procedure section 594] is for the plaintiffs 'to prove up damages' is also erroneous . . . where a defendant who has answered fails to appear for trial, the correct procedure is to proceed with the trial for which the defendant has had notice to which he has failed to respond. The trial is uncontested only in the sense the defendant is not present to participate. His answer is on file and is effective. Thus the plaintiff is required to prove all the essential allegations of the complaint controverted by the answer"].) While there may be circumstances under which a hearing conducted pursuant to Code of Civil Procedure section 594 was so cursory that it properly could be treated as the equivalent of a default proceeding, the claims administrator may not, as he did here, automatically equate the two. The liquidation court, on the other hand, reviewed the proceedings in the underlying action and found that the trial judge in fact had made an independent determination of Rampart's liability, untainted by any fraud or collusion. This factual determination must be upheld if supported by substantial evidence, as it plainly is. (See *Low III, supra,* 110 Cal.App.4th at

p. 1544.) The underlying judgment was entered after a five-day trial in which other defendants participated and during which the witnesses upon whose testimony the liability of Rampart rested were cross-examined both by counsel for the other defendants and by the judge, who was the trier of fact. The remaining defendants and the judge clearly engaged the issues. We find no basis to reject the finding of the liquidation court that the trial court in the underlying action made a reasoned determination of Rampart's liability.

■ The claims administrator argues that the liquidation court erred in finding that the underlying trial was not collusive, but there is simply no evidence in the record to support this contention. " 'Collusion has been variously defined as (1) "a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right"; (2) "a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers"; and (3) "a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes." ' " (*Span, Inc. v. Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463, 484 [277 Cal.Rptr. 828].) The administrator argues that certain aspects of the judgment were not supported by the evidence, but he does not allege a secret or deceitful arrangement between the parties to bring this about, nor point to any evidence that there was any such arrangement. Had Golden Eagle taken the opportunity to intervene in the action, it would have been able to argue to the trial court that the evidence did not support the damages sought. Since it voluntarily chose not to intervene, and does not challenge the order denying its motion to set aside the judgment and permit intervention, the claims administrator may not now challenge the correctness of the judgment. The issue at this point is not whether the trial court came to the right conclusions in the underlying action, but whether it did so based upon its own evaluation of the evidence uninfluenced by fraud or collusion of the parties.

### 3. *Coverage*

The parties agree that the liquidation court was entitled to examine the issue of coverage, since that issue was not adjudicated in the underlying action.[11] "An insurer that has been notified of an action and refuses to defend

---

[11] Claimants apparently took the contrary position in the proceedings below, but their position that coverage had been adjudicated was rejected by the liquidation court and they now concede that the court properly examined the issue in the liquidation proceedings. (See, e.g., *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 279 [54 Cal.Rptr. 104, 419 P.2d 168] ["the court in the third party suit does not adjudicate the issue of coverage . . . . The only question there litigated is the insured's *liability*"].)

on the ground that the alleged claim is not within the policy coverage is bound by a judgment in the action, in the absence of fraud or collusion, as to all material findings of fact essential to the judgment of liability of the insured. The insurer is not bound, however, as to issues not necessarily adjudicated in the prior action and can still present any defenses not inconsistent with the judgment against the insured." (*Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 561–562 [334 P.2d 881].) The liquidation court found that Golden Eagle had not waived its coverage defenses and that certain components of the judgment were covered and that others were not. The claims administrator argues that the liquidation court erred to the extent that it found portions of the judgment covered, and claimants argue that the court erred in concluding that Golden Eagle was not precluded from asserting its coverage defenses and in finding that portions of the judgment were not covered.

### a. *Loss of right to contest coverage*

We first address claimants' argument that the liquidation court erred in rejecting their contention that Golden Eagle forfeited its right to contest coverage. The administrator does not contend that Golden Eagle reserved such a right, but argues that claimants have the burden to establish that Golden Eagle intentionally waived that right, and did not do so.

It is undisputed that Golden Eagle had a duty to defend Rampart in the underlying action. "The duty to defend is broader than the obligation to indemnify, from which it must be distinguished. The duty to defend exists whenever an insurer ascertains facts which give rise to the *potential* of liability to indemnify. . . . [¶] Thus, when a suit against an insured alleges a claim that potentially could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that the *claim cannot be covered*." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1185–1186 [96 Cal.Rptr.2d 136] (*Ringler*).) "The obligation to defend is measured by the terms of the policy and the allegations of the complaint against the insured and where the complaint reveals potential liability within the policy, the duty to defend arises." (*Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 753 [161 Cal.Rptr. 322] (*Miller*).)

The policies at issue here provided that Golden Eagle would "pay those sums that the insured becomes obligated to pay as damages because of 'bodily injury' or 'property damages.' " "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." "Property damage" is defined as "a. Physical injury to tangible property, including all resulting loss of use of that

property . . . . or [¶] b. Loss of use of tangible property that is not physically injured . . . ." The original complaint alleged "resulting damage to [claimant's] property . . . and personal injuries resulting from Defendants' conduct." The allegations in the various complaints implicated the language in the policies and thus created a duty to defend on the part of Golden Eagle, which the administrator does not dispute.

An insurer that is obligated to provide a defense may, and typically does, reserve its right to raise at a later time policy defenses such as lack of coverage. In California, it is settled that "if the insurer adequately reserves its right to assert the noncoverage defense later, it will not be bound by the judgment [against the insured]." (*Gray v. Zurich Insurance Co., supra,* 65 Cal.2d at p. 279.) "Thus the insurer can avoid being bound by the judgment against the insured if it secures a nonwaiver agreement from the insured [citations] or makes an adequate reservation of rights." (*Val's Painting & Drywall, Inc. v. Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 586 [126 Cal.Rptr. 267].) However, "[I]f a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage." (*Miller., supra,* 100 Cal.App.3d at p. 755.)

In *Miller,* the insured started a fire in his home by working on his motorcycle in an enclosed space that contained a gas water heater. The homeowners' insurer, National American Insurance Company (National), paid for the damages, but brought a subrogation claim against Elite Insurance Company (Elite), which had issued a policy on Miller's motorcycle. That policy contained an exclusion from coverage for "injury to or destruction of property owned or transported by the insured, or property rented to or in charge of the insured." (*Miller, supra,* 100 Cal.App.3d at p. 748.) Elite established a reserve fund and took the position that it would settle the case for a small percentage of the damages, but that if the case was not settled for the amount it offered it would deny coverage under the exclusion. Elite did not inform Miller of its position, and it rejected a slightly higher settlement demand made by the homeowners' insurance company, which then sued Miller. Only after Miller asked Elite if he needed to retain his own counsel to defend the action did Elite inform him that it was denying coverage. Miller settled the suit, sued Elite, and prevailed on his claims for compensatory and punitive damages. The Court of Appeal held that Elite had waived its right to deny coverage. "Elite, by its conduct in proceeding to deal with National as though Elite intended to represent and defend Miller, created the impression that there was no coverage dispute. Further, appellant never communicated to Miller that the insurance company intended to reserve its rights based on possible noncoverage under exclusion clause (e). It appears from the record

below that the insurer's agent, Ryan, was uncertain about Elite's duty to defend. It may be that by its conduct alone Elite waived the right to reserve a denial of coverage, but coupled with its failure to notify Miller of the contemplated reservation, waiver of the right was established." (*Id.* at p. 754.)

Although it concluded that Elite had waived its coverage defenses, the *Miller* court went on to analyze Miller's argument that Elite also should be estopped from contesting coverage. It listed the elements necessary to find that equitable estoppel should be applied: "(1) that the person to be estopped had knowledge of the true facts; (2) that action on his part intended or reasonably interpreted as intended to be acted upon by the person asserting the estoppel; (3) that the one asserting the estoppel was ignorant of the true facts; and (4) that there was detrimental reliance on the estopped person's conduct." (*Miller, supra,* 100 Cal.App.3d at p. 754.) The *Miller* court then found that Elite was in possession of all the relevant facts; that Miller reasonably could have interpreted the policy as covering the damages caused by his motorcycle; that Miller was ignorant of the fact that Elite was reserving its rights; that Miller's detrimental reliance was evidenced by his failure to retain an attorney and his failure to negotiate with Elite, the homeowners or the homeowners' insurance company; and that Miller was harmed by his failure to compromise the claim. (*Id.* at pp. 755–756.)

The *Miller* court presumably addressed both waiver and estoppel because, "In California . . . the theory that by defending the suit an insurer 'waives' its right to claim noncoverage rests upon the doctrine of estoppel. There must be a showing that the insurer either intentionally relinquished a known right, *or* acted in such manner as to cause the insured reasonably to believe the insurer had relinquished such right, and that the insured relied upon such conduct to his detriment." (*Val's Painting & Drywall, Inc. v. Allstate Ins. Co., supra,* 53 Cal.App.3d at p. 587, italics added.) "Although courts talk in terms of waiver, the rule is more accurately one of equitable estoppel: The insurer's undertaking defense of the third party suit creates a high potential for *misleading* the insured, by creating the impression the insurer is not disputing coverage. And, the insured may rely thereon by failing to retain independent counsel to negotiate or defend the action." (Crosky et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2001) ¶ 7:712, p. 7B-59.)

In this case, the liquidation court relied on *Ringler, supra,* 80 Cal.App.4th at page 1184, in holding that "failure to reserve rights is not a waiver unless the court finds by clear and convincing evidence that an intentional relinquishment of a policy provision was intended by the insurer . . . . Claimants have not met this burden; consequently, Golden Eagle is not estopped from raising policy coverage defenses." In *Ringler,* the insurer did not reserve its rights regarding coverage for two years after undertaking the defense. In

dismissing the argument that the insurer had failed to adequately reserve its right to contest coverage, and thus had waived its policy defenses, this court noted, "Waiver requires the intentional relinquishment of a known right upon knowledge of the facts. The burden is on the party claiming a waiver of right to prove it by clear and convincing evidence that does not leave the matter to speculation. As a general rule, doubtful cases will be decided against the existence of a waiver. [Citations.] . . . [Citations.] [¶] In the insurance context, California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage, and a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. [Citations.] Thus, an insured's subjective understanding of its insurer's conduct is insufficient to establish waiver, absent some evidence of actual intent. [Citation.] For this reason, the courts have repeatedly held that an insurer does not waive or relinquish any coverage defenses it fails to assert at the time of its acceptance of a tender of defense, even when it does not make any express and full reservation of rights for a substantial period of time after the defense has been accepted." (*Ringler, supra,* 80 Cal.App.4th at pp. 1188–1189.)

█ In virtually every case discussing the waiver issue after *Miller, supra,* 100 Cal.App.3d 739, the courts have found that there was no waiver if the insurer made a reservation of rights at any time, even if years after the defense was undertaken. (See, e.g., *Ringler, supra,* 80 Cal.App.4th 1165; *State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1627 [29 Cal.Rptr.2d 840]; *Insurance Co. of the West v. Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1318 [241 Cal.Rptr. 427], disapproved on other grounds by *Buss v. Superior Court* (1997) 16 Cal.4th 35, 50, fn. 12 [65 Cal.Rptr.2d 366, 939 P.2d 766] and *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 841, fn. 13 [88 Cal.Rptr.2d 366, 982 P.2d 229]; but see *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1838–1839 [54 Cal.Rptr.2d 176].)

We do not question the liquidation court's reliance on *Ringler* to negate a *waiver* by Golden Eagle of its coverage defenses. However, the absence of an intentional waiver does not preclude an estoppel, and it does not appear that the liquidation court determined whether an estoppel had been established. In *Ringler,* this court found no estoppel because there was no possibility of coverage under the terms of the policy, and because by providing a defense for two years, the insurer gave the insured a windfall, rather than causing a detriment. (*Ringler, supra,* 80 Cal.App.4th at p. 1190.) In contrast, the administrator does not dispute that the complaint in this case created the possibility of coverage under the policy and the concomitant duty to defend the suit. It is unclear exactly when Golden Eagle assumed defense of the case, but the administrator implies in its opening brief that Golden Eagle

undertook Rampart's defense shortly after Lyon's cross-complaint was served in January 1993. The record contains no indication that Golden Eagle reserved its rights when it did so or at any time thereafter.[12]

In response to interrogatories propounded by the claimants, Rampart answered without qualification that it was covered by a commercial general liability policy issued by Golden Eagle. Golden Eagle provided a defense until July 1, 1996, when Rampart was excused due to its suspended corporate status. Bill Harris was the president and the responsible managing director of Rampart, and the only living director of the corporation at the time that Rampart was suspended. He appears to have been the controlling shareholder of Rampart.[13] Harris was deposed as an individual and as the person most knowledgeable of a related corporation, Rampart Precast, Inc., and without objection answered many questions about the operations of Rampart. Harris testified that Golden Eagle never advised him that it could not continue to defend the action unless Rampart paid its corporate taxes. He testified that he was never informed that the case was going to trial or that Rampart's suspension would prevent defense of the action. He did not learn that the matter had gone to trial until after judgment had been entered, when an investigator appeared at his house and told him of the judgment against Rampart. Thus there is substantial evidence that would support a finding that Rampart suffered detriment from relying on the understanding that Golden Eagle had accepted responsibility for resolution of the claimants' action. The principal owner of Rampart believed that defense of the action was occurring and did not know that failure to pay approximately $1,600 in franchise taxes could ultimately expose the company to well over a million dollars in damages, which the claims administrator now argues are not covered by the policy. Ramparts' understanding that Golden Eagle was handling the matter may have been responsible for its failure to reinstate its corporate status or to settle the action.

However, by a petition for rehearing filed in this court after the issuance of our initial opinion, the claims administrator for the first time has directed our attention to evidence in the record suggesting that there was no detrimental

[12] The claims administrator's opening brief states: "On January 13, 1993, Lyon served Rampart with a cross-complaint for express and implied contractual indemnity, total and partial equitable indemnity, contribution and repayment and declaratory relief. . . . Golden Eagle agreed to defend Rampart *under a reservation of rights* and assigned the defense to its in-house counsel, Luna, Brownwood & Rice." (Italics added.) The date on which the defense was undertaken is not specified, nor is there a citation to the record from which a date might be obtained. Although the brief states that Golden Eagle tendered defense "under reservation of rights," no citation to the record appears to support that proposition, and in the administrator's response to claimants' waiver argument, the assertion that a reservation of rights was made is noticeably absent.

[13] Harris owned 2.7 to 3 percent of the shares in Rampart and could not recall anyone who owned a greater percentage of the shares.

reliance on Golden Eagle's failure to reserve its right to deny coverage under the policy. Harris testified that at the time of the underlying action Rampart had been defunct since 1994 and that there were already outstanding judgments against it. He testified that one company "sued us for, I'm guessing, 14 or 15 million dollars and I think they got a judgment." If there was an outstanding judgment against the corporation of this magnitude at the time of the underlying trial, the trier of fact might reasonably conclude that Harris would not have revived the corporation, attempted to settle the claimants' action, or done anything differently if he had been aware that Golden Eagle was contesting coverage. Since the existence of detrimental reliance necessary to support an estoppel is a question of fact which the liquidation court did not consider, we must remand the matter to the liquidation court to decide this question in the first instance. If on remand the liquidation court finds that Rampart did detrimentally rely on the understanding that Golden Eagle had accepted responsibility for the payment of claimants' claims,[14] Golden Eagle and thus the administrator is estopped from asserting policy defenses, and claimants are entitled to an order establishing their right to receive the full amount of the valid judgment against Rampart, including the property damages of $283,322.53 which the liquidation court determined were not covered by the Golden Eagle policies. (*Stonewall Ins. Co. v. City of Palos Verdes Estates, supra,* 46 Cal.App.4th at pp.1838–1839.)[15] On the other hand, if the liquidation court finds that there was no detrimental reliance and therefore no estoppel, then the propriety of including this and other valid portions of the underlying judgment in the November 9, 2001 order turns upon the correctness of the liquidation court's rulings on the coverage defenses. We proceed to decide the coverage issues so that this long-pending litigation necessarily will be concluded once the liquidation court determines the estoppel issue.

*3.b.–5*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[14] Because Golden Eagle withdrew its defense without notifying Rampart that it was doing so, Golden Eagle might well have been estopped to deny liability even if it had previously issued a reservation of rights. In either case, the question of detrimental reliance is determinative.

[15] While there is some irony in the fact that any efforts Rampart would have exerted had it known that it was at risk might have reduced the amount of claimants' recovery from Rampart, claimants now stand in the shoes of Rampart and are therefore entitled to assert Rampart's claim of estoppel. (See *Canadian Ins. Co. v. Rusty's Island Chip Co.* (1995) 36 Cal.App.4th 491, 497 [42 Cal.Rptr.2d 505].)

[*]See footnote, *ante*, page 694.

DISPOSITION

The matter is remanded to the liquidation court to determine whether Golden Eagle is estopped from asserting its coverage defenses. If the liquidation court finds that Golden Eagle is estopped from asserting its coverage defenses, then the order, dated November 9, 2001, determining the amounts claimants are entitled to recover under Golden Eagle's policies, should be modified to determine that claimants are entitled to recover $283,322.33 for property damage, $540,000.00 for damages as assignees of Lyon, and $139,416.44 for costs, for a total of $962,738.77, plus interest at the legal rate from July 9, 1996. If the liquidation court determines that Golden Eagle is not estopped from asserting its coverage defenses, then the order should be modified to determine that claimants are not entitled to recover any damages for property damage or as assignees of Lyon but are entitled to recover $139,416.44 in costs, plus interest at the legal rate from July 9, 1996. In either event, claimants are not entitled to recover for personal injury or for their attorney fees. In all other respects, the orders from which these appeals have been taken are affirmed.[22] The parties shall bear their respective costs on appeal.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied March 25, 2004.

---

[22] The liquidation court of course has the authority to determine the propriety of any offsets to which the claims administrator may claim to be entitled because of payments already made.